**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DOMINIC HARDIE,
*Plaintiff-Appellant*,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, a nonprofit
association,
*Defendant-Appellee.*

No. 15-55576

D.C. No.
3:13-cv-00346-
GPC-DHB

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
Gonzalo P. Curiel, District Judge, Presiding

Argued and Submitted January 11, 2017
Pasadena, California

Filed June 27, 2017
Amended September 11, 2017

Before: Richard C. Tallman and Michelle T. Friedland,
Circuit Judges, and David A. Faber,* District Judge.

---

* The Honorable David A. Faber, United States District Judge for
the Southern District of West Virginia, sitting by designation.

Order;
Opinion by Judge Tallman;
Concurrence by Judge Faber

## SUMMARY[**]

### Civil Rights Act / Title II

The panel affirmed the district court's summary judgment in favor of the National Collegiate Athletic Association ("NCAA") in an action brought by Dominic Hardie, who is African-American, alleging that the NCAA's policy of excluding anyone with a felony conviction from coaching at NCAA-certified youth athletic tournaments violated Title II of the Civil Rights Act of 1964.

Title II of the Civil Rights Act of 1964 prohibits racial discrimination in places of public accommodation. The district court granted summary judgment for the NCAA on the ground that disparate-impact claims were not cognizable under Title II.

The panel did not decide whether Title II encompassed disparate-impact claims.

The panel held that even if disparate-impact claims were recognizable under Title II, Hardie had not shown that an equally effective, less discriminatory alternative theory to the NCAA's felon-exclusion policy existed, as was required under the three-step analysis for disparate-impact claims set

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

forth in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989).

Concurring in part and concurring in the judgment, District Judge Faber agreed with the court that under Title II, Hardie had not stated a cognizable claim. In his view, Title II's text did not recognize disparate-impact liability, and the panel should have said so. Judge Faber also wrote that even if Title II had authorized disparate-impact liability, the business-necessity defense would immunize the NCAA's policy; and the majority's application of extraneous evidence was misplaced.

## COUNSEL

James Sigel (argued) and Jack W. Londen, Morrison & Foerster LLP, San Francisco, California; Brian R. Matsui, Morrison & Foerster LLP, Washington, D.C.; Jon Greenbaum, Lawyers' Committee for Civil Rights Under Law, Washington, D.C.; Jeffrey M. David, Call & Jensen, Newport Beach, California; for Plaintiff-Appellant.

Seth P. Waxman (argued), Ari Holtzblatt, David M. Lehn, and Daniel S. Volchok, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for Defendant-Appellee.

Joshua P. Thompson and Wencong Fa, Pacific Legal Foundation, Sacramento, California, for Amici Curiae Pacific Legal Foundation, Center for Equal Opportunity, and Competitive Enterprise Institute.

**ORDER**

The opinion and concurrence filed on June 27, 2017, are amended as follows:

1.  At page 17 of the slip opinion, delete the sentence: <Perhaps, because of self-selection or other factors, the coaching population differs from the population studied.>.

2.  At page 20 of the slip opinion, change <predict the racial effect> to <analyze the racial effect>, and delete <on the NCAA's applicant pool in particular>.

The concurring opinion is amended as follows:

1.  At page 28 of the slip opinion, change <*Co*> to <*Co.*>.

2.  At page 33 of the slip opinion, change <predict the racial effect of individualized assessments on the NCAA's applicant pool in particular> to <analyze the racial effect of individualized assessments>.

The panel has voted to deny the petition for panel rehearing. Judges Tallman and Friedland have voted to deny the petition for rehearing en banc and Judge Faber so recommends.

The full court has been advised of the petition for rehearing and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are **DENIED**. No further petitions for rehearing or rehearing en banc will be entertained.

---

## OPINION

TALLMAN, Circuit Judge:

Plaintiff Dominic Hardie appeals the district court's entry of summary judgment in his suit against the National Collegiate Athletic Association (NCAA). Hardie, who is African American, alleges that the NCAA's policy of excluding anyone with a felony conviction from coaching at NCAA-certified youth athletic tournaments violates Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a(a), which prohibits racial discrimination in places of public accommodation. Hardie's suit rests on a disparate-impact theory of Title II liability. We have never endorsed or rejected disparate-impact liability under Title II, and we need not decide this issue today. We hold that even if disparate-impact claims are cognizable under Title II, Hardie has not shown that an equally effective, less discriminatory alternative to the NCAA's felon-exclusion policy exists, as he must do under the three-step analysis for disparate-impact claims set forth in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989). We affirm summary judgment for the NCAA.

I

The NCAA is a voluntary, unincorporated association of over 1,200 colleges and universities. One of the functions of the NCAA is to develop rules that govern intercollegiate athletics, including rules that limit recruitment of student-

athletes. As part of their recruitment activities, coaches and other athletics staff from NCAA member schools attend nonscholastic[1] youth athletic tournaments to scout potential recruits. Under NCAA rules, coaches and recruiters from Division I schools may attend nonscholastic tournaments only if the tournaments have obtained certification from the NCAA to verify that they are in compliance with NCAA guidelines. Without such attendance, the chances that players might be scouted and later recruited to play for an NCAA school are significantly diminished. This in turn affects the willingness of teams to play in uncertified tournaments and the profitability of private sponsors who organize these events.

The NCAA's guidelines impose a number of requirements on tournament operators to ensure the safety of participants and preserve the integrity of college athletics recruiting. The guidelines restrict the number of games athletes may play in, for example, and they mandate that tournament operators obtain insurance and hire medical personnel. Importantly here, the guidelines require that tournament operators abide by the NCAA Participant Approval Policy. The Participant Approval Policy provides that anyone seeking to coach at an NCAA-certified nonscholastic tournament must submit to a criminal background check. Under the current version of the policy, anyone who has been convicted of a felony is automatically denied approval to coach in an NCAA-certified tournament. If a tournament operator fails to comply with NCAA guidelines, including the Participant Approval Policy, the tournament will not receive NCAA certification, and NCAA

---

[1] Nonscholastic tournaments are tournaments in which the participating teams are unaffiliated with schools.

Division I coaches and recruiters may not attend the uncertified tournament to scout for new talent.

The NCAA did not always ban anyone with a felony conviction from coaching at certified tournaments. The first Participant Approval Policy governing women's basketball, adopted in 2006, disqualified only prospective coaches who had been convicted of a violent felony,[2] a sex offense, a crime involving children, or a nonviolent felony if the nonviolent felony conviction was less than seven years old. The NCAA asserts, however, that the 2006 policy caused safety concerns and administrative difficulties. Certain crimes classified as nonviolent, including financial crimes, sports bribery, and possession of controlled substances, nonetheless raised significant safety and ethical concerns about coaches interacting with student-athletes. Additionally, differences between states' classification of the same crimes led to inconsistent outcomes with respect to who was approved as a tournament coach and who was not.

In light of these challenges, the NCAA amended the Participant Approval Policy in 2011 to eliminate the violent-nonviolent felony distinction. Now, anyone with a felony conviction, no matter how old, is denied entry approval to coach. Any prior sex offense conviction, regardless of the charge level, and "active criminal cases" are also disqualifying. Coaches approved under the Participant Approval Policy may coach at NCAA-certified tournaments for two years, and then must reapply.

In conformance with the amended Participant Approval Policy, Dominic Hardie was denied approval to coach at the

---

[2] The NCAA defined "violent felonies" as crimes committed against a person and punishable by at least one year in prison.

2013 MidSummer Night's Madness Western Tournament, an annual NCAA-certified girls' basketball tournament in San Diego. In 2001, Hardie had pled guilty and was convicted for possession of a controlled substance (cocaine), a felony in Texas. Hardie's felony conviction had not affected his ability to coach in NCAA-certified tournaments before the Participant Approval Policy was amended. Under the pre-2011 version of the policy, Hardie had been able to coach because his only conviction was over seven years old and was for a nonviolent felony. But in 2012, when Hardie's coaching approval expired and he reapplied, he was barred from coaching under the amended policy banning all felons. Hardie was allowed to attend the 2013 MidSummer Night's Madness tournament as a spectator, but he could not participate from the coaches' bench. Hardie alleges this prevented him from having personal contact with the student-athletes he coaches during the tournament games, which negatively affected his team members' performance and opportunities to earn college athletics scholarships to NCAA schools.

After exhausting his administrative remedies without obtaining approval to coach, Hardie sued the NCAA in federal district court to enjoin enforcement of the Participant Approval Policy.[3] Hardie alleges that the Participant Approval Policy violates Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a(a), by denying him the full and

---

[3] Hardie's First Amended Complaint also named the operator of the MidSummer Night's Madness tournament, the International Girls Basketball Organization (IGBO), and the owners of the tournament venues, Alliant International University and Town and Country Hotel, LLC, as defendants. Hardie later jointly agreed to dismiss his claims against these defendants.

equal enjoyment of a place of public accommodation.[4] Originally, Hardie advanced both disparate-treatment and disparate-impact theories of Title II liability; on appeal, he now pursues only a disparate-impact theory. To prevail on his claim, Hardie must prove that the Participant Approval Policy has a "'disproportionately adverse effect on minorities' and [is] otherwise unjustified by a legitimate rationale." *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2513 (2015) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). He need not show that the NCAA acted with a "discriminatory intent or motive." *See id.* Hardie alleges that "[t]he NCAA's categorical bar" on coaches with felony convictions "falls disproportionately on African Americans like Hardie, who are more than three times as likely as white Americans to have suffered a felony conviction."

To prove the Participant Approval Policy's disparate impact, Hardie offers a report prepared by economist Marc Bendick. Bendick surveyed 541 applicants who sought participant approval to coach at NCAA-certified

---

[4] Title II provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a). "Public accommodations" include, among other things, "sports arena[s], stadium[s] or other place[s] of exhibition or entertainment," so long as their "operations affect commerce, or if discrimination or segregation by it is supported by State action." 42 U.S.C. § 2000a(b). The NCAA does not dispute that coaching in NCAA-certified athletic tournaments constitutes a "privilege" of a place of public accommodation. *See Daniel v. Paul*, 395 U.S. 298, 306 (1969) (holding that Title II protects from discrimination "spectators," "listeners," and "those where entertainment takes the form of direct participation in some sport or activity").

nonscholastic youth basketball tournaments between 2011 and 2013. Among applicants surveyed, 46.5% of those approved under the Participant Approval Policy were African American, while 80.1% of those denied because of a felony conviction were African American. Bendick's results thus show that African American applicants "were represented among felony denied applicants at 1.72 times their representation among approved applicants." A supplemental report Bendick prepared using "geocoding"[5] produced similar results. In the supplemental report, African American applicants represented 40.3% of applicants denied because of a felony conviction, compared to 26.5% of approved applicants, meaning that African Americans were represented among felony-denied applicants at a rate 1.52 times higher than among approved applicants. Bendick states that the survey and geocoding results are statistically significant.[6]

The NCAA moved for summary judgment on Hardie's Title II claim. The district court granted summary judgment for the NCAA, concluding that disparate-impact claims are not cognizable under Title II. Hardie timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

---

[5] "Geocoding" involves using U.S. Census Bureau data to predict the race of applicants based on their home addresses. In his supplemental report, Bendick used geocoding to predict the race of 1,105 applicants using home addresses provided by the NCAA.

[6] Bendick undertook these data-gathering efforts because the NCAA did not itself collect information on the race of applicants for coaching approval.

II

"We review a district court's grant of summary judgment *de novo*, and may affirm on any basis supported by the record." *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1047 (9th Cir. 2009). On review of a grant of summary judgment, we "must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Szajer v. City of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011) (quoting *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004)).

III

On appeal, the NCAA does not challenge Hardie's argument that Title II encompasses disparate-impact claims. Instead, the NCAA asks us to affirm entry of summary judgment in its favor on either of two other grounds advanced below, assuming arguendo that disparate-impact claims are cognizable under Title II. First, the NCAA contends that it did not deny Hardie a privilege of a place of public accommodation because tournament operators, not the NCAA, enforce the Participant Approval Policy. Second, the NCAA argues that Hardie has failed to meet his burden under *Wards Cove Packing Co. v. Atonio*[7] of showing in support of his disparate-impact claim that an equally effective, less discriminatory alternative to the felony ban under the Participant Approval Policy exists. We

---

[7] 490 U.S. 642 (1989), superseded by statute on other grounds, 42 U.S.C. § 2000e-2(k), as recognized in Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 135 S. Ct. 2507, 2523 (2015).

affirm summary judgment for the NCAA on the latter ground.

## A

Neither the Supreme Court nor we have decided whether disparate-impact claims are cognizable under Title II. A few courts have found that Title II authorizes disparate-impact claims, *see Olzman v. Lake Hills Swim Club, Inc.*, 495 F.2d 1333, 1341–42 (2d Cir. 1974); *Robinson v. Power Pizza, Inc.*, 993 F. Supp. 1462, 1464–66 (M.D. Fla. 1998), while others have rejected disparate-impact liability under Title II, *see, e.g.*, *Akiyama v. U.S. Judo Inc.*, 181 F. Supp. 2d 1179, 1187 (W.D. Wash. 2002); *LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1370 n.2 (S.D. Fla. 1999). Several courts have declined to decide the issue altogether. *See, e.g.*, *Arguello v. Conoco, Inc.*, 207 F.3d 803, 813 (5th Cir. 2000); *Jefferson v. City of Fremont*, 73 F. Supp. 3d 1133, 1145–46 (N.D. Cal. 2014) (citing cases).

We express no view today on whether Title II encompasses disparate-impact claims. Even if Title II authorized such claims, Hardie has not met his burden under *Wards Cove* of showing that an equally effective, less discriminatory alternative to the Participant Approval Policy exists.

## B

In *Wards Cove*, the Supreme Court laid out a burden-shifting framework that applies to disparate-impact claims.[8]

---

[8] The Civil Rights Act of 1991, Pub. L. No. 102-166, § 105, 105 Stat. 1071, 1074 (1991), abrogated *Wards Cove* with respect to claims under Title VII, but the Supreme Court has continued to apply *Wards Cove* burden shifting to other antidiscrimination statutes. *See*

490 U.S. at 658.  Burden shifting serves to limit disparate-impact liability "in key respects that avoid the serious constitutional questions that might arise . . . if such liability were imposed based solely on a showing of statistical disparities." *Inclusive Cmtys.*, 135 S. Ct. at 2522.  Disparate-impact liability may only condemn practices or policies that are "artificial, arbitrary, and unnecessary."  *Id.* at 2524 (internal quotation mark omitted) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)).  The parties here agree that, assuming Title II encompasses disparate-impact claims, the *Wards Cove* framework would apply to Hardie's claim.

*Wards Cove* burden shifting proceeds in three steps.  First, a plaintiff must establish a prima facie case that the defendant's challenged policy or practice has a "significantly disparate impact on nonwhites." *Wards Cove*, 490 U.S. at 658.  At the prima facie stage, the plaintiff must point to "the application of a specific or particular . . . practice that has created the disparate impact under attack." *Id.* at 657.  This "robust causality requirement ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Inclusive Cmtys.*, 135 S. Ct. at 2523 (quoting *Wards Cove*, 490 U.S. at 653).

Next, if a plaintiff makes out a prima facie case, "the case will shift to any business justification [defendants] offer for their use of these practices." *Wards Cove*, 490 U.S. at 658. "This phase of the disparate-impact case contains two components: first, a consideration of the justifications [a

*Smith v. City of Jackson*, 544 U.S. 228, 240 (2005) (applying the *Wards Cove* framework to the Age Discrimination in Employment Act).

defendant] offers for his use of these practices; and second, the availability of alternative practices to achieve the same . . . ends, with less racial impact." *Id.*

At the justification step of *Wards Cove* burden shifting, the defendant must show that the "challenged practice serves, in a significant way, the legitimate . . . goals of the [defendant]." *Id.* at 659. The defendant's practice need not be "essential" or "indispensable" to achieving its stated goal, but the relationship between the practice and its purpose must be more than "insubstantial." *Id.* While the defendant must produce evidence that the practice serves legitimate ends, "[t]he ultimate burden of proving that discrimination against a protected group has been caused by a specific . . . practice remains with the plaintiff *at all times*." *Id.* (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 997 (1988)).

Finally, if the defendant provides a legitimate justification for the challenged practice, the plaintiff must demonstrate that an alternative practice (1) would "serve the [defendant's] legitimate . . . interest[s]," and (2) would not have a "similarly undesirable racial effect." *Id.* at 660 (third alteration in the original) (internal quotation mark omitted) (quoting *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975)). The plaintiff's proposed alternative(s) must be "equally effective" as the defendant's chosen policy at serving the defendant's interest(s), taking into account "[f]actors such as the cost or other burdens" that alternative policies would impose. *Id.* at 661 (alteration in original) (quoting *Watson*, 487 U.S. at 998). A proposed alternative lacks a "similarly undesirable racial effect" if it results in "less disparate impact" compared to the challenged policy. *Inclusive Cmtys.*, 135 S. Ct. at 2518; *Ricci*, 557 U.S. at 578. This means plaintiffs must show not merely that an

alternative policy would exclude fewer nonwhites, but that the alternative would reduce the overall racial disparity between whites and nonwhites. In some circumstances, an alternative policy may exclude fewer nonwhites but, because many more whites than nonwhites benefit under the alternative policy, the alternative actually exacerbates racial disparities. Alternative policies that are less restrictive than the challenged policy but do not result in "less disparate impact" will not withstand scrutiny at step three.[9]

Applying the *Wards Cove* framework here, Hardie relies on the Bendick report to establish a prima facie case of disparate impact. The Bendick report reveals that African Americans were significantly overrepresented—by a factor of 1.52 to 1.72—among felony-denied applicants compared to approved applicants. The NCAA does not contest that Bendick's results represent a significant racial disparity, and we agree. Furthermore, because Bendick surveyed only coaches who sought approval after the amended Participant Approval Policy took effect, and because he identified coaches who were denied specifically because of a prior

---

[9] Hardie would have us frame the "less disparate impact" question somewhat differently. He contends that, to satisfy this part of the third step of the *Wards Cove* analysis, he would only need to show that prohibiting coaches with nonviolent felonies independently has a disparate impact on African Americans. By Hardie's logic, if people with nonviolent felonies, a group that is disproportionately African American, were allowed to coach, African Americans would disproportionately benefit. We need not evaluate this argument. As explained below, one of Hardie's proposed alternatives—reverting to the pre-2011 policy—falters on the "equally effective" prong of the third step of the *Wards Cove* analysis, not the "less disparate impact" prong. And Hardie's logic does not even apply to his other alternative— individual assessments—because not all prospective coaches with nonviolent felonies would necessarily be allowed to coach under that policy.

felony conviction, the Bendick report also establishes a "causal connection" between the Participant Approval Policy's blanket felon ban and the disproportionate effect on African American coaching applicants. *See Inclusive Cmtys.*, 135 S. Ct. at 2523.

At *Wards Cove* step two, the NCAA contends that the Participant Approval Policy serves the NCAA's interest in "protecting the safety of the children who participate in the tournaments and the integrity of the NCAA's recruiting process and college athletics more generally." For the most part, Hardie accepts that the NCAA's proffered rationale for the Participant Approval Policy is legitimate. We also agree.

The parties' disagreement thus focuses on step three of the *Wards Cove* analysis. To satisfy his burden at step three, Hardie proposes two alternatives to the Participant Approval Policy: (1) the NCAA could revert to the pre-2011 version of the policy, which disqualified applicants with violent but not nonviolent felony convictions that were at least seven years old; or (2) the NCAA could conduct individualized assessments of applicants with felony convictions to determine if they would pose an unacceptable risk to the safety of tournament participants. We hold that Hardie has failed to show that either of his proposed alternatives would be both equally effective compared to, and less discriminatory than, the current policy. We address each of these alternatives in turn.

1

Hardie first proposes that the NCAA revert to the version of the Participant Approval Policy that was in effect before 2011. The pre-2011 policy excluded applicants convicted of a violent felony, a sex offense, or a crime involving children,

no matter how old, or a nonviolent felony conviction if the conviction was less than seven years old.

We find Hardie has failed to establish that the pre-2011 policy would be equally effective as the current policy in serving the NCAA's legitimate interests. Hardie contends that the pre-2011 policy was proven equally effective because no documented safety incidents occurred during the few years when that version of the policy was in force. But the NCAA could have reasonably concluded that the level of risk under the pre-2011 policy was unacceptable, even if no tournament participants had yet been harmed. *Cf. El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 244 (3d Cir. 2007) ("In a broad sense, hiring policies . . . ultimately concern the management of risk."). Indeed, Hardie has not rebutted the NCAA's assertion that under the pre-2011 policy, certain nonviolent felonies, such as financial crimes, possession of controlled substances, and sports bribery, posed unreasonable risks for the safety of student-athletes and the integrity of the recruiting process.

To compare the relative effectiveness of the pre-2011 policy and the current policy, Hardie submits a report by Dr. Kiminori Nakamura, a criminologist and expert on recidivism. The Nakamura report concludes that the probability that someone with a prior conviction will recidivate decreases the longer that person goes without committing another crime. At some point, known as the "redemption time," the risk that someone with a prior conviction will reoffend becomes equal to the risk of arrest for the general population.[10] For people convicted of violent crimes, the redemption time is four to seven years; for drug

---

[10] The Nakamura report measures general population risk including people with and without criminal histories.

and property crimes, the redemption time is shortened to about four years.  Nakamura states that, because Hardie has not committed another criminal offense since 2001, and because of his age, employment, and educational achievements, his risk of future arrest is in fact lower than that of the general population.

For several reasons, the Nakamura report does not establish that the pre-2011 Participant Approval Policy overall screens coaching applicants as effectively as the current policy.  First, it does not attempt to quantify and compare the risk of future arrest for those permitted to coach under the current Participant Approval Policy with the risk of those permitted under the pre-2011 version.  Second, Nakamura acknowledges that, even after many years have passed, the risk of future arrest for someone who has a criminal record may remain higher than the risk of future arrest for someone who has never been arrested.  Hardie has offered no evidence to suggest that this difference in risk, even if small, is immaterial to achieving the NCAA's interests.  Particularly considering that NCAA-approved coaches work with minors, we cannot conclude on the record before us that this additional risk is insignificant.

We view this case as similar to *El v. Southeastern Pennsylvania Transportation Authority*, 479 F.3d 232 (3d Cir. 2007), in which the Third Circuit affirmed summary judgment for a local transit authority in a Title VII suit.  *Id.* at 235.  The transit authority in that case refused to hire anyone who had been convicted of a violent crime as a paratransit driver for disabled residents.  In support of its policy, the transit authority offered unrebutted evidence that, even after many years, people convicted of violent crimes "are at least somewhat more likely than members of the general population to commit a future violent act."  *Id.* at

246. The transit authority's expert testified that, even if the additional risk that a former violent felon posed "might be small," "given the marked sensitivity of the paratransit position at issue, a small but extant difference is sufficient" to justify the policy. *Id.* at 246–47. Analogizing to Hardie's Title II claim here, Hardie has offered no evidence to suggest that the increased risk posed by coaches with prior felony convictions, even if small, is immaterial to protecting the safety of young athletes. *Cf. N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 587 n.31 (1979) (holding that transit authority was justified in refusing to hire methadone users for "safety-sensitive" positions). Nor does he offer evidence to address the increased risk to preserving the integrity of college athletics from nonviolent crimes like sports bribery.[11]

We must also note that reverting to the pre-2011 policy would impose some increased administrative burden on the NCAA's participant approval process. The NCAA submitted evidence that the 2011 amendment to the Participant Approval Policy was motivated in part by administrative difficulties in distinguishing between violent and nonviolent crimes given states' differing definitions of the same offenses. While costs and other administrative burdens are only a "factor" in the equal effectiveness analysis, *see Wards Cove*, 490 U.S. at 661, and perhaps only a small one in this case, the increased administrative burden

---

[11] We do not mean to suggest that the small risk posed by individuals with nonviolent felony convictions will always be material. In some cases, the risk presented by a felony conviction will be a generalized one, attenuated from the work of the organization in question. We are not presented with that situation here, though. In this context, where coaches often travel with, are responsible for, and have a great deal of influence over minors, and where certain crimes are particularly relevant to the integrity of college athletics recruiting, the risk is material.

here is an additional factor that weighs slightly in the NCAA's favor.

In sum, Hardie has not carried his burden at step three of the *Wards Cove* framework with respect to this proposed alternative. He has not adduced sufficient evidence from which a reasonable jury could conclude that excluding violent felons, but not nonviolent felons, from coaching would be equally effective at achieving the NCAA's goals as the current policy. While we recognize that the plaintiff's burden at the alternatives stage is a demanding one, courts must take caution before displacing reasonable business judgments. *Wards Cove*, 490 U.S. at 661 ("Courts are generally less competent than employers to restructure business practices." (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978))). Because we hold that Hardie has failed to prove that the pre-2011 Participant Approval Policy would serve the NCAA's legitimate interests as effectively as the current policy, we need not decide whether reverting to the pre-2011 policy would result in a lesser adverse racial effect.

2

As a second alternative, Hardie proposes that the NCAA conduct individualized assessments of applicants with a felony conviction to calculate the actual risks posed by an applicant. Hardie's expert on human resources practices, Lester S. Rosen, states that individualized assessments may take into account factors such as "any mitigating circumstance about the offense, the age of the offense, . . . past employment, educational achievements since the offense, and other signs of rehabilitation."

Hardie's individualized assessments alternative fails at step three of the *Wards Cove* analysis, because he has put

forward no evidence from which a reasonable jury could conclude that individualized assessments would have less disparate impact than the current Participant Approval Policy. None of Hardie's experts analyze the expected racial impact of individualized assessments using the criteria Hardie proposes. The Rosen report only remarks generally that "[t]here is widespread recognition that a policy of automatically rejecting an applicant on the basis of a felony conviction, without any consideration of the offense, the position in question, the age of the offense, and evidence of rehabilitation, is both unfair and potentially violates Civil Rights laws." Hardie also points to EEOC Guidelines that recommend employers adopt individualized assessments as a tool to avoid Title VII liability in the employment context. U.S. Equal Emp. Opportunity Comm'n, No. 915.002, EEOC Enforcement Guidance: Consideration of Arrest and Conviction Records in Employment Decisions Under Title VII of the Civil Rights Act of 1964 18 (2012). Neither the Rosen report nor the EEOC Guidelines analyze the racial effect of individualized assessments. Without more, we cannot say that Hardie has met his burden to show that individualized assessments would be a less discriminatory alternative to the current Participant Approval Policy.

Because neither of Hardie's proposed alternatives to the Participant Approval Policy pass muster at the final stage of *Wards Cove* burden shifting, the NCAA is entitled to summary judgment.

### C

Alternatively, the NCAA urges us to affirm summary judgment on the ground that it has not actually denied Hardie a "privilege[] . . . of [a] place of public accommodation," 42 U.S.C. § 2000a(a), because tournament operators, rather than the NCAA, actually enforce the Participant Approval

Policy.    Because we find that Hardie failed to produce
sufficient proof at step three of the *Wards Cove* analysis, we
need not reach this alternative basis for upholding summary
judgment.

IV

We do not decide today whether Title II of the Civil
Rights Act of 1964 encompasses disparate-impact claims.
Even assuming arguendo that disparate-impact claims are
cognizable under Title II, Hardie has not created a genuine
issue of material fact that one of his proposed alternatives to
the NCAA's Participant Approval Policy would be both
equally effective and less discriminatory.    The NCAA is
therefore entitled to summary judgment.

**AFFIRMED.**

FABER, District Judge, concurring in part and concurring in
the judgment:

I agree with the Court that under Title II, Appellant
Dominic Hardie has not stated a cognizable claim.    Yet the
Court skirts a key issue that this case squarely presents:
Whether disparate-impact claims are cognizable under Title
II.

In my view, Title II's text does not recognize disparate-
impact liability, and we should clearly say so.[1]    Title II

---

[1] The Court's statement that "the [National Collegiate Athletic
Association ('NCAA')] does not challenge Hardie's argument that Title
II encompasses disparate-impact claims," Maj. op. at 11, tells only part
of the story.  True, the NCAA chooses to devote no part of its brief before

recognizes only disparate-treatment claims: claims involving intentional discrimination. Even if Title II did recognize disparate-impact liability, the "business[-]necessity" defense, as the Court makes clear, requires us to reject Hardie's claim. *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2517 (2015). Lastly, extraneous evidence such as human resources experts', economists' and criminologists' reports is not helpful in determining what Title II requires. Such evidence is malleable and enables a court to adopt the result-oriented expedient it prefers.

## I. *Title II's Text Precludes Disparate-Impact Liability.*

The text of Title II does not authorize disparate-impact liability, which typically flows from "practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Inclusive Cmtys. Project*, 135 S. Ct. at 2513 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (internal quotation marks omitted)). Under disparate-impact liability, "a facially neutral . . . practice may be deemed [unlawfully discriminatory] without evidence of the [defendant's] subjective intent to discriminate that is required in a 'disparate-treatment' case." *Wards Cove Packing Co. v.*

---

this Court on that issue. However, the NCAA did raise it below, prevailed on that ground before the district court, and preserved that ground for our consideration. In fact, the NCAA stated: "In light of the NCAA's decision not to defend the district court's reasoning, the Court may deem it appropriate to appoint an amicus curiae to do so." In other words, the NCAA strategically chose to focus on the narrower reasons in its brief. However, *amici* Pacific Legal Foundation ("PLF"), the Competitive Enterprise Institute ("CEI"), and the Center for Equal Opportunity ("CEO") have argued most ably that Title II does not authorize disparate-impact liability.

*Atonio*, 490 U.S. 642, 645—46 (1989), *superseded by statute on other grounds*, Civil Rights Act of 1991, §105, 105 Stat. 1074—1075, 42 U.S.C. § 2000e—2(k) (1994 ed.).

42 U.S.C. § 2000a(a) ("Equal Access"), which is the relevant Title II provision, states:

> All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

Title II imposes no liability on organizations based on an individual's exclusion from public places over which the organization did not have actual control, or at least some close connection. In order to impose Title II liability, a court must find that the defendant intentionally has engaged in racial discrimination in the enjoyment of public accommodations—also known as *disparate treatment*. Hence, the defendant itself must have denied someone or withheld from someone a privilege of a public accommodation or, at a bare minimum, have a concrete, material link to the public accommodation in question. *See Clegg v. Cult Awareness Network*, 18 F.3d 752, 756 (9th Cir. 1994) (twice using the phrase "closely connected"); *Welsh v. Boy Scouts of America*, 993 F.2d 1267, 1272 (7th Cir. 1993) (deploying the "close[] connect[ion]" test). Only in that circumstance is a plaintiff's exclusion from such a privilege fairly attributed to the defendant. Otherwise, the defendant may not be subjected to the cost and the opprobrium that Title II liability inflicts.

The National Collegiate Athletic Association ("NCAA") does not have such a connection to any place or activity from which Hardie was allegedly excluded, nor does it have such a connection to any act of exclusion itself. Any decision to exclude Hardie was made and carried out by entities separate from the NCAA; the NCAA had no authority or control over those entities. Such places and activities were free to continue these tournaments, albeit without NCAA approval. The federal courts must be extremely hesitant to second-guess the decisions of non-governmental entities charged with the responsibility of developing standards and running activities. Here, the NCAA has that responsibility, and is better equipped to exercise it than the courts are. Therefore, any exclusion of Hardie should not be attributed to the NCAA.

Furthermore, the courts must demand that Title II contain a "clear statement" of congressional intent in order to infer that it authorizes disparate-impact liability. *I.N.S. v. St. Cyr*, 533 U.S. 289, 298—99 (2001). The Supreme Court has instructed that we must employ a "clear statement" rule when we confront a question of statutory construction that "invokes the outer limits of Congress' power." *Id*. at 299. The rule requires "the clearest statement of congressional intent," *id.* at 312 n.35, so that the courts can be "perfect[ly] confiden[t] that Congress in fact intended" to wade into areas of "special constitutional concern[]." *Dellmuth v. Muth*, 491 U.S. 223, 231 (1989). The rule ensures "that the legislature . . . intended to bring into issue . . . the critical matters involved in the judicial decision." *United States v. Bass*, 404 U.S. 336, 349 (1971). Requiring a clear statement from Congress suggests that "'Congress does not exercise lightly' the 'extraordinary power' to legislate." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247, 2256

(2013) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

Disparate-impact liability implicates two constitutional concerns: equal protection and federalism. With respect to equal protection, when the courts racially balance the participants in public accommodations, they impose what is effectively a quota—be it fixed or moving. This quota arrangement confines a participant to the playing room allotted to her race; like Linda Brown and her contemporaries more than sixty-three years ago, today's participant must learn to tailor her aspirations to the quota system's ingenious *separate but equal* regime. *See Brown v. Board of Education*, 347 U.S. 483 (1954). Shifting quotas such as those which disparate-impact liability foists on us are "[g]overnment action[s]" that "divid[e] us by race." *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 746 (2007) (plurality opinion). They are "inherently suspect because such classifications promote notions of racial inferiority and lead to a politics of racial hostility, reinforce the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin, and endorse race-based reasoning and the conception of a Nation divided into racial blocs, thus contributing to an escalation of racial hostility and conflict." *Id.* (plurality opinion) (citations and internal quotation marks omitted). "One of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merit and essential qualities." *Rice v. Cayetano*, 528 U.S. 495, 517 (2000). Since an impartial sovereign ordinarily may not make one set of rules for one race and another set of rules for another race, disparate-impact liability triggers equal-protection concerns. *See Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976) ("The federal

sovereign, like the States, must govern impartially."); *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954) ("Classifications based solely upon race must be scrutinized with particular care, since they are contrary to our traditions, and hence constitutionally suspect.").

As for federalism, federal anti-discrimination statutes like Title II often deter state and local governments from implementing their own affairs, including their traditional police-power prerogatives. *See*, *e.g.*, *Inclusive Cmtys. Project*, 135 S. Ct. 2507 (state agency); *Magner v. Gallagher*, 619 F.3d 823 (8th Cir. 2010), *cert. dismissed*, 565 U.S. 1187 (2012) (municipal government); *In re Employment Discrimination Litigation Against State of Ala.*, 198 F.3d 1305 (11th Cir. 1999) (state agency). After all, Title II imposes the same obligations on state and municipal actors as it does on private actors. "The constitutionally mandated balance of power between the States and the Federal Government" exists "to ensure the protection of our fundamental liberties." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) (citations and internal quotation marks omitted). Because disparate-impact liability would "radically readjust[] the balance of state and national authority" under Title II's aegis, its text need clearly say that this is the proper result. *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994) (citations omitted).

Title II contains no such clear statement. "All persons shall be entitled to the full and equal enjoyment . . . without discrimination or segregation," Title II says. 42 U.S.C. § 2000a(a). Since "[t]he statute does not define 'discriminat[ion]'" or "segregation," I consult "the ordinary meaning[s] of the word[s]." *CSX Transp., Inc. v. Ala. Dept. of Revenue*, 562 U.S. 277, 286 (2011). The ordinary meaning of the word "discrimination" refers to the

defendant's "*mak[ing]* a difference in treatment or favor on a class or categorical basis in disregard of individual merit." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 648 (1976) (emphasis added). Additionally, an outcome-determinative Supreme Court opinion has defined "discrimination" as "*[p]referring* members of any one group for no reason other than race or ethnic origin." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978) (opinion of Powell, J.) (emphasis added).

In this context, *making* personnel selection or *preferring* one person over another on an impermissible basis presupposes the defendant's subjective intent; it involves disparate treatment. No actor can absentmindedly, by relying on subconscious stereotypes, or otherwise without a deliberately discriminatory intent or motive slip into intentional behavior such as preferring persons on a racial or ethnic basis. That would be an oxymoron. When English speakers say that someone has discriminated against a person on a forbidden ground, they are saying that committing discrimination was the actor's intent or motive. Statistical disparities indicating that certain "practices . . . fall more harshly on one group than another," *International Broth. of Teamsters v. United States*, 431 U.S. 324, 335, n. 15 (1977), do not establish that the defendant's disfavor on the basis of "the protected trait . . . actually motivated [her] decision" to prefer some persons over others. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993). By contrast, disparate-impact liability bars practices that generate disproportionately adverse consequences, even when the organizer's motivations appear neutral, so long as there exists "an available alternative . . . practice that has less disparate impact and serves the [organization's] legitimate needs." *Ricci*, 557 U.S. at 578. Accordingly, Title II's decision to maximize the role of the defendant's subjective

intent and to minimize the role of any statistical disparities is the opposite of how disparate-impact liability operates.

Similarly, under Title II, "segregation" is the "[unlawful] policy of *separating* people on the basis of color, nationality, religion, or the like." BLACK'S LAW DICTIONARY 1388 (8th ed. 2004) (emphasis added). This definition, too, presupposes the actor's subjective intent; it involves disparate treatment. No actor can absentmindedly, by relying on subconscious stereotypes, or otherwise without a deliberately segregation-effectuating intent or motive slip into intentional behavior such as separating persons on a forbidden basis. When English speakers say that someone has segregated members of one group from members of another group on a prohibited basis, they are saying that committing segregation was the actor's intent or motive. Racially-correlated statistical disparities do not establish that the defendant's disfavor on the basis of "the protected trait . . . actually motivated [her] decision" to segregate persons from one another. *Hazen Paper Co.*, 507 U.S. at 610. Contrast this with disparate-impact liability, which eradicates practices that generate disproportionately adverse effects, even when the organizer's motivations appear neutral, so long as there exists "an available alternative . . . practice that has less disparate impact and serves the [organization's] legitimate needs." *Ricci*, 557 U.S. at 578. It follows that Title II's decision to maximize the role of the defendant's subjective intent and to minimize the role of any statistical disparities is the opposite of how disparate-impact liability works.

Besides, Title II lacks a catch-all mechanism encompassing disparate-impact claims. Unlike the Fair Housing Act ("FHA"), which the *Inclusive Cmtys. Project* Court understood to authorize disparate-impact liability,

Title II contains no "results-oriented phrase" such as
"'otherwise make unavailable.'"    135 S.Ct. at 2518—19
(quoting 42 U.S.C. § 3604(a)).    Consequently, Title II
authorizes only disparate-treatment liability.

## II. *Business-Necessity Defense under Title II Protects the NCAA.*

Even if Title II had authorized disparate-impact liability,
the business-necessity defense would immunize the
NCAA's policy.  In *Inclusive Cmtys. Project*, the Supreme
Court highlighted the long pedigree of the "'business[-
]necessity'  .  .  .  defense to disparate-impact claims."
135 S.Ct. at 2517 (citations and internal quotation marks
omitted).  The defense must also apply to Title II, if we
assume that Title II covers such claims.  As long as there is
"a manifest relationship" between the requirement and the
organizational necessity, the court will uphold the
requirement.  *Griggs v. Duke Power Co.*, 401 U.S. 424, 432
(1971) (citations and internal quotation marks omitted).  But
"it remains open to the complaining party to show that other
tests or selection devices, without a similarly undesirable
racial effect, would also serve the [organizer's] legitimate
interest in efficient and trustworthy workmanship."
*Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975)
(citations and internal quotation marks omitted).  Hardie has
demonstrated nothing of the sort.  Nor could he.

The NCAA's or, for that matter, similar organizations'
legitimate, *bona fide* interest in setting up a wholesome
environment with good role models for youth cannot be
outweighed by some need to give former felons a chance to
assimilate into society at this level.  The NCAA's interest in
promoting "efficient and trustworthy [relationships]" among
the athletes and their coaches, *id.*, cannot be served without
having coaches who are good role models for youth, which

is not a criterion that Title II prohibits. Perhaps in the NCAA's eyes, a felony conviction disqualifies someone from being a good role model. Moreover, the NCAA might not want to enhance its risk of exposure to liability, if the former felon should commit a crime or a tort while he is a participant. Thus, the NCAA does not wish to be affiliated with youth athletic tournaments coached by former felons. The NCAA has the right, one with robust constitutional dimensions, to decide with whom it will associate, *see Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000) ("The forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association [under the First Amendment] if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints.")—and no one can fault the NCAA. This limited restriction is consistent with Title II. Had the NCAA wanted to impose a *blanket* ban on former felons, Title II would have so permitted.

## III. *Resorts to Irrelevant and Extraneous Evidence are Impermissible.*

The majority's application of extraneous evidence such as human resources experts', economists' and criminologists' reports to this case is, in my view, misplaced. First, considering such materials for the purposes of applying Title II to certain facts does not fall within the judicial function's province. Second, it gives litigants the license to cherry-pick the convenient evidence they wish to submit and thus the ability to game the litigation. Third, it is not something that federal judges untutored in statistics, economics, sociology, criminology, and other social sciences are even competent to ascertain and adjudicate. Even if, by dint of luck, the designated federal judge were capable of engaging in competent social-science analysis to

figure out if the impact were disparate, her doing so would not elicit the public's confidence in the legitimate discharging of the judicial role.  Never does Article III, when investing the "judicial [p]ower," U.S. Const., Art. III, § 1, cl. 1, in the federal courts, allow our reasoning to be informed by "questionable social[-]science research rather than [legal] principle." *Missouri v. Jenkins*, 515 U.S. 70, 114 (1995) (Thomas, J., concurring).  The Framers of our Constitution would have seen the federal courts' considering such evidence as mere "pretext for" the Third Branch to "gradual[ly] and unobserved[ly] usurp[]" the policy-making "power" that the Constitution commits to our coordinate branches.  *The Federalist* No. 42, p. 265 (C. Rossiter ed. 1961) (J. Madison).

That a disproportionately high number of felons might self-identify as members of any particular race(s) does not somehow convert the NCAA policy into a racially discriminatory one.  Certainly, "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in *exclusively or predominantly* by a particular class of people, an intent to disfavor that class can readily be presumed.  A tax on wearing yarmulkes is a tax on Jews," for instance.  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993) (emphasis added).  A causal relationship between yarmulkes and Jewish people is obvious.  But committing felonies is not "predominantly" co-extensive with or an essential element of self-identifying with certain races; and saying otherwise is both inaccurate and demeaning to individuals who do self-identify with those races.  *Id*.  The latter assertion might be the result of invidious discrimination, of the soft bigotry of low expectations, or of both.  In any event, it "rests on an assumption of [racial] inferiority."  *Jenkins*, 515 U.S. at 114 (Thomas, J.,

concurring). Moreover, holding a defendant liable on that basis would set a pernicious precedent that the Supreme Court expressly has rejected in materially indistinguishable circumstances. *See, e.g.*, *McCleskey v. Kemp*, 481 U.S. 279, 312 (1987) (rejecting "study indicat[ing] a discrepancy that appears to correlate with race.").

The future need not be grim with limitless disparate-impact claims under Title II. Think of the children and young adults, some of the most vulnerable members of our society. What will happen to entertainment platforms for young people to demonstrate their gifts and diligence? Must such platforms admit former felons, just because those former felons belong to certain races? Does it depend on what some criminologist, sociologist, statistician or other social scientist has to say about the matter today? No and it should not. What about swimming meets where coaches can see the swimmers in compromising attire? Do former felons who happen to self-identify with particular races get a free pass in hiding behind their races and taking part in those meets? Why would Hardie's argument not apply to both coaches *and judges* at athletic and performing-arts competitions? (If the coaches can be former felons, then so too can the judges and many other stakeholders be!) Indeed, the more subjective the craft, the worse it will be for the organizers because then they have to worry about handling both felonious coaches and felonious judges. Could this not lead the organizers to shut down various productive, public-service enterprises altogether, thereby depriving our youth (and all of us) of countless opportunities? Will this not wreak havoc on our Nation's "vibrant and dynamic free-enterprise system[s]," *Inclusive Cmtys. Project*, 135 S. Ct. at 2518, committed to altruistic or profit-minded endeavors? Since the opportunity costs would be so devastating, the prospect is an unwelcome one, which—yet again—is the

reason that Title II does not authorize disparate-impact liability.

The courts undoubtedly have no power to so authorize on the basis of fickle evidence, namely protean materials like the Nakamura report, with respect to which the Court says that "Hardie has offered no evidence to suggest that this difference in risk, even if small, is immaterial to achieving the NCAA's interests." Maj. op. at 18. But what if Hardie had—and the Court had thought it valid? What if tomorrow Dr. Kiminori Nakamura expands or contracts the study's scope, makes new findings and devises Version 2.0 of the same report? Does Title II's meaning or application have to evolve based on what these non-vetted, democratically non-legitimized academic studies have to say? The federal courts' privileging certain sympathetic studies without adequately investigating their probative value or the prejudicial effect they will have is akin to our "look[ing] over the heads of the crowd and pick[ing] out [our] friends." ANTONIN SCALIA, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 36 (1997).

Likewise, today "[n]either the Rosen report nor the [Equal Employment Opportunity Commission ('EEOC')] Guidelines" happen to "analyze the racial effect of individualized assessments." Maj. op. at 21. So the Court deems them insufficiently helpful to Hardie's claim. However, if just a few years down the road the Rosen report, the EEOC Guidelines, and other extraneous evidence do end up predicting such a "racial effect," id., will we then allow an identical claim to proceed? I hope not, for that would turn us into dilettante social scientists and, worse, into omnipotent social engineers, a role we have neither the expertise nor the authority to fulfill. Consulting the *cognoscenti's* social-science research, which frequently is

fraught with flawed methodologies and philosophical, political, and other biases, to decide legal questions is tantamount to putting a thumb on the scales to produce a palatable result.

None of this reflects the limitations attending a federal judicial commission. Alexander Hamilton believed that the federal courts would be "the best expedient which can be devised in any government" because they help "secure a steady, upright, and impartial administration of the laws" that the whole of the American People, not just the conclave of experts, have enacted. *The Federalist* No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton). Accountable to and representative of the American People, the political branches are composed of members "sufficiently numerous to feel all the passions which actuate a multitude." *The Federalist* No. 47, p. 332 (C. Van Doren ed. 1945) (J. Madison). Neither of these traits is true of the experts or, for that matter, of the federal courts. Designed to be "the least dangerous" branch, *The Federalist* No. 78, p. 465, one without any "political rights," *id.*, we are empowered to exercise "neither force nor will but merely judgment," *id.* (capitalization altered), when we construe our People's statutory and constitutional commands.

*          *          *

Since Title II lacks "unmistakably clear" language authorizing disparate-impact liability, it does not reach such claims. *Atascadero State Hosp.*, 473 U.S. at 242. Also clear is the business-necessity defense, which precludes Hardie's claim.

I respectfully concur in part and concur in the judgment.