**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SOUTHWEST FAIR HOUSING
COUNCIL, INC., an Arizona nonprofit
corporation; TAVITA PENA; JENNIFER
PETERS,

*Plaintiffs-Appellants*,

v.

MARICOPA DOMESTIC WATER
IMPROVEMENT DISTRICT, an Arizona
municipal corporation,

*Defendant-Appellee.*

No. 20-15506

D.C. No.
2:17-cv-01743-
DWL

ORDER AND
OPINION

Appeal from the United States District Court
for the District of Arizona
Dominic Lanza, District Judge, Presiding

Argued and Submitted May 5, 2021
Portland, Oregon

Filed November 12, 2021

Before:  William A. Fletcher, Carlos T. Bea, and
Michelle T. Friedland, Circuit Judges.

Opinion by Judge Bea

**SUMMARY** [*]

**Fair Housing Act**

The panel withdrew an Opinion filed August 23, 2021; replaced it with a superseding Opinion affirming the district court's summary judgment in favor of the Maricopa Domestic Water Improvement District; denied a petition for panel rehearing; and denied on behalf of the court a petition for rehearing en banc, in a case in which two Pinal County public housing residents and Southwest Fair Housing Council, Inc., an Arizona nonprofit corporation (together, "Appellants"), challenged as impermissibly discriminatory under the federal Fair Housing Act a District policy increasing to $180 the refundable security deposit required of new public housing customers before the District would agree to provide water services while non-public housing customers were subject only to a $55 deposit.

Appellants' primary argument alleged the policy caused a disparate impact under the Fair Housing Act because it applied only to the District's public housing customers, who are disproportionately African American, Native American, and single mothers. The district court granted the District summary judgment on the basis that Appellants failed to provide evidence sufficient to establish a triable issue of fact that the policy caused the claimed disproportionate effect (an element of a prima facie disparate impact case). In light of *Texas Department Housing & Community Affairs v. The Inclusive Communities Project, Inc.*, 576 U.S. 519, 540 (2015), the panel clarified that, for a plaintiff to make out a

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

prima facie case of disparate impact, the plaintiff must demonstrate: (1) the existence of a policy, not a one-time decision, that is outwardly neutral; (2) a significant, adverse, and disproportionate effect on a protected class; and (3) robust causality that shows, beyond mere evidence of a statistical disparity, that the challenged policy, and not some other factor or policy, caused the disproportionate effect. The district court held that Appellants failed to demonstrate robust causality.  The panel held that the district court erred in that judgment, concluding that Appellants did establish robust causation and did meet their prima facie burden.  The panel nonetheless affirmed the district court's judgment because the District established by undisputed evidence that the policy served in a significant way the District's legitimate business interests and because Appellants failed to establish a triable issue of fact that there existed an equally effective, but less discriminatory, alternative.

Appellants also brought a disparate-treatment claim, alleging that discriminatory animus was a motivating factor behind the District's decision to implement its policy.  The panel affirmed the district court's holding that Appellants did not adduce evidence sufficient to establish a triable issue of fact with respect to that claim.

**COUNSEL**

Elizabeth Brancart (argued) and Christopher Brancart, Brancart & Brancart, Pescadero, California; Paul Gattone, Law Office of Paul Gattone, Tucson, Arizona; for Plaintiffs-Appellants.

Jeffrey C. Matura (argued) and Melissa J. England, Barrett & Matura P.C., Scottsdale, Arizona, for Defendant-Appellee.

Jeffrey L. Taren and Jesse Wing, MacDonald Hoague & Bayless, Seattle, Washington, for Amici Curiae National Fair Housing Alliance Inc., Fair Housing Council of Oregon, Fair Housing Advocates of Northern California, Fair Housing Center of Washington, Fair Housing Council of Riverside County Inc., Fair Housing Council of San Diego, Fair Housing Foundation, Housing Rights Center, Inland Fair Housing and Mediation Board, Intermountain Fair Housing Council, Montana Fair Housing, Northwest Fair Housing Alliance, Project Sentinel, Silver State Fair Housing Council, Fair Housing Napa Valley, and Legal Aid Society of Hawai'i.

**ORDER**

The Opinion filed on August 23, 2021, is **WITHDRAWN** and replaced with a superseding Opinion filed concurrently with this Order.

The panel unanimously voted to deny the petition for panel rehearing.  Judges Fletcher and Friedland voted to deny the petition for rehearing en banc and Judge Bea so recommends.  The full court has been advised of the petition for rehearing on banc and no judge has requested a vote on whether to rehear the matter en banc.  Accordingly, appellant's petition for panel rehearing and for rehearing en banc filed September 27, 2021, is **DENIED**.  Fed. R. App. P. 35.

**IT IS SO ORDERED.**

---

**OPINION**

BEA, Circuit Judge:

The federal Fair Housing Act ("FHA") bars discriminatory housing policies and practices, including those that cause a disparate impact according to certain protected characteristics or traits—race, color, religion, sex, handicap, familial status, or national origin.  But, absent evidence of intentional discrimination or equally effective and less discriminatory alternatives, the existence of a statistical disparity in a policy's effect on persons with certain protected characteristics, as compared to the wider population, does not authorize courts to invalidate policies that a defendant is able to show serve legitimate governmental or business interests in a significant way.  We

are empowered to invalidate only artificial, arbitrary, and unnecessary barriers to housing. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 540 (2015) (hereinafter, *Inclusive Communities*). The policy at issue here is no such barrier.

The Maricopa Domestic Water Improvement District (the "District") is a small municipal corporation in Arizona that supplies water to some three hundred households, including the public housing tenants of one residential complex in Pinal County, Arizona. Property owners like Pinal County are responsible to the District for paying any past tenant's delinquent water accounts. Pinal County acknowledged its responsibility to pay its public housing tenants' delinquent water bills but consistently refused to do so, contending it was immune to that policy based on Pinal County's status as a public municipality. After years of failed tactics and fruitless negotiations with Pinal County, the District imposed a new policy that increased to $180 the refundable security deposit required of new public housing customers before the District would agree to provide water services. New non-public housing customers were subject only to a $55 deposit.

Public housing residents Tavita Peña and Jennifer Peters, along with Southwest Fair Housing Council, Inc., an Arizona nonprofit corporation which describes itself as having a mission to achieve equal access to housing (together, "Appellants"), challenge this policy as impermissibly discriminatory under the FHA. Appellants' primary argument alleges the policy caused a disparate impact because it applied only to the District's public housing customers, who are disproportionately African American, Native American, and single mothers. The district court granted the District summary judgment on the

basis that Appellants failed to provide evidence sufficient to establish a triable issue of fact that the policy caused the claimed disproportionate effect (an element of a prima facie disparate impact case).  We hold the district court erred and we conclude that Appellants established a prima facie disparate impact claim.  However, we nonetheless affirm the district court's judgment because the District established by undisputed evidence that the policy served in a significant way the District's legitimate business interests and because Appellants failed to establish a triable issue of fact that there existed an equally effective, but less discriminatory, alternative.

Appellants also bring a disparate-treatment claim, alleging that discriminatory animus was a motivating factor behind the District's decision to implement its policy.  We affirm the district court's holding that Appellants did not adduce evidence sufficient to establish a triable issue of fact with respect to that claim.

## BACKGROUND

Appellee Maricopa Domestic Water Improvement District is a small nonprofit municipal corporation created by Pinal County, Arizona, in 1986.  The District is a public utility, providing water services to private residents within the town of Maricopa, Arizona, as well as to some public property owned by Pinal County within the town limits.  The District services approximately 300 households.

Among those are the households at Edwards Circle.  The Edwards Circle complex is a federally funded public housing complex owned and managed by Pinal County.  Each of Edwards Circle's twenty public housing units receives water service from the District.

The demographics of the District's customers at Edwards Circle diverge from those of the District's full customer base. The households that comprise the District's full customer base are 45.0% White, 2.9% African American, 2.2% Native American, and 49.7% Hispanic, with 34.3% of households headed by women with children. In 2017, the households that comprised Edwards Circle were 11.1% White, 38.9% African American, 16.7% Native American, and 33.3% Hispanic, with 89% of households headed by women with children.

In addition to having dissimilar demographics, the customers at Edwards Circle are unique among District customers in another respect: they are tenants of Pinal County. Though they are both public entities, the District and Pinal County have had a rather disharmonious relationship. The source of that strife, and the subject of this case, is how to confront the issue of delinquent water bills left over the years by Edwards Circle tenants.

For each of its customers, the District requires an upfront, refundable (when the customer terminates water service and is fully paid-up) deposit as a condition to providing water services. Of course, all property owners are responsible to the District for their own water service fees, but, since at least 2000, the District has maintained a policy, to which Pinal County initially assented, that requires property owners renting their property also to pay any delinquent water service bills left by their tenants in excess of the tenants' forfeited deposits. If the property owner refuses to pay its tenant's delinquency, District procedure is to place a lien on the property. Ultimately, execution of the lien can lead to foreclosure and loss of title to the property.

In accordance with the District's said property owner policy, Pinal County (as owner of the Edwards Circle

complex) avowed that it was indeed responsible for its tenants' delinquent accounts. Unfortunately for the District, it would not be so easy to get Pinal County to comply with that admission.

In 2001, to prevent excessive delinquent accounts and thereby limit its own potential liability, Pinal County authorized the District to shut off water service to Edwards Circle tenants who were late on their water payments. But Pinal County soon reversed that position and requested that the District reactivate water services to tenants with late accounts. Thereafter, in 2002, the district raised the security deposit for Edwards Circle residents to $100, a decision which appears to have gone unchallenged.

The issue of delinquent water accounts at Edwards Circle soon again raised its head, but Pinal County responded by burying its own head in the sand. From 2011 through 2013, the District sent multiple notices of tenant delinquency to Pinal County, requesting that the County pay off the balances. One such outstanding delinquent bill amounted to $184.45. Although Pinal County had previously acknowledged responsibility for paying its tenants' delinquent bills, it consistently refused to pay the District.

Pursuant to the District's delinquency policy, it threatened Pinal County with a lien on the Edwards Circle property. The County responded that, unlike all other District customers, the County's property was immune to liens, stating that "[i]t is unlawful in Arizona to lien public property." The District then changed tacks. The District decided it would withhold providing new water service accounts to any unit whose prior tenant vacated with a delinquent balance until the prior tenant's unpaid bills were paid off. The County again refused to pay, again on the basis of its status as a public entity, but this time the County

claimed that paying off debts of ex-tenants would "violate the anti-gift clause in the [Arizona] Constitution." Soon thereafter, a new Edwards Circle tenant was unable to obtain water services because they could not pay off the prior tenant's bill. Pinal County emailed the District and requested that the District turn on water service for that tenant and offered to "iron out the delinquency issue later."

When the District attempted to arrange a meeting so the parties could "iron out" the issue, Pinal County did not respond. Months later, the District sent Pinal County another message again requesting that Pinal County agree to "[a] resolution [that] will benefit our entities and [] the potential tenants at [Edwards Circle]." Pinal County and the District met seven months later in November 2014.

Arising out of that meeting, the District announced a new policy effective January 1, 2015 (the "Service Deposit Policy") that made changes applicable only to "Pinal County Housing tenants." In its announcement, the District indicated that "both parties concluded the Service Deposit amount for [Edwards Circle] tenants should be increased."[1] New public housing customers at Edwards Circle were now required to pay a $180 refundable service deposit. The service deposit for new non-public housing customers remained at $55.

Plaintiffs-Appellants Tavita Peña and Jennifer Peters both moved into units at Edwards Circle in 2016 and had difficulty paying the District's heightened security deposit. Peña is Hispanic, Peters is White, and both are single mothers with children. Both Peña and Peters were eventually able to pay the increased security deposit with

---

[1] Appellants dispute whether Pinal County agreed to the new policy.

financial   assistance   from   relatives   or   nonprofit organizations.

With the help of fellow plaintiff Southwest Fair Housing Council, Peña and Peters filed a lawsuit against the District.**[2]** Appellants' amended complaint alleged that the District's Security Deposit Policy "injured plaintiffs by discriminating on the basis of race, color, national origin, sex, familial status and disability in the provision of municipal services and in the interference with the exercise of rights protected under the Fair Housing Act, 42 U.S.C. §§ 3604 and 3617." They seek declaratory and injunctive relief.**[3]**

---

**[2]** Appellants also named Pinal County as a defendant and alleged civil rights claims under 42 U.S.C. §§ 1983 & 1986. However, Appellants and Pinal County reached a settlement.

**[3]** In Appellants' first amended complaint, they allege that the District also created two other policies applicable only to Edwards Circle residents: a Late Payment Policy and a No Outstanding Balance Policy. In addition to a 1.5% late payment fee applicable to all customers, the Late Payment Policy allegedly applied to make Pinal County tenants' security deposits refundable only at the discretion of the District if a tenant had provided late payments four times within one year. The No Outstanding Balance Policy allegedly required Pinal County tenants to pay off balances owed to the District by a prior tenant.

There is record evidence that the District did devise the Late Payment Policy at least, but the District now states that neither policy currently exists and that neither policy will be enforced against Edwards Circle residents. At oral argument, the District's counsel represented that the District would not have "any problem whatsoever" with informing Edwards Circle residents that these policies will not be enforced against them. Appellants' counsel then agreed that, if the District would not enforce these policies in the future, their claims regarding these policies "could be resolved" and agreed with the possibility of settlement given that it seemed the parties no longer had a dispute about these policies. We rely on the District's representations

Without first moving to dismiss, the District answered the amended complaint and then moved for summary judgment on the FHA claim. The district court granted the District's motion for summary judgment. The court concluded that Appellants had failed to make out a prima facie disparate-impact claim because they had failed to demonstrate robust causation between the Security Deposit Policy and the statistical disparity that Appellants had identified. The district court also determined that Appellants failed to plead a disparate-treatment claim and that, even if they had, Appellants did not adduce sufficient evidence to raise a genuine dispute of material fact. Appellants timely appealed the district court's order granting summary judgment. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## STANDARD OF REVIEW

"We review a grant of summary judgment de novo. Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Devereaux*

---

that these policies will not be enforced against any Edwards Circle resident in the future. The only remedy Appellants seek as to these policies is to enjoin their further enforcement against Edwards Circle residents. "Article III requires that a live controversy persist throughout all stages of the litigation." *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1128–29 (9th Cir. 2006) (en banc). Because it now appears that no controversy exists as to these two policies, we **DISMISS** the portion of Appellants' appeal that challenges the Late Payment Policy and No Outstanding Balance Policy claims. The remainder of our analysis continues to rely on the District's representation that the security deposits paid by Edwards Circle residents are non-discretionarily refundable as long as a customer does not leave behind a delinquent balance.

*v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc) (citations omitted). "A dispute about a material fact is genuine if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997) (quotation marks and citation omitted). "If the plaintiff is unable to sufficiently adduce evidence that could lead a reasonable jury to conclude that the plaintiff has satisfied his burden of proof, his claim is subject to an unfavorable summary disposition." *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." (quotation marks and citation omitted)).

## ANALYSIS

The FHA makes it unlawful to discriminate against a person on the basis of "race, color, religion, sex, handicap, familial status, or national origin" and applies broadly to many housing practices. 42 U.S.C. § 3604. Specifically, § 3604(b) prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith" because of the person's membership in one of those protected classes. Appellants argue the District's provision of water services pursuant to the Security Deposit Policy discriminated against Edwards Circle residents on the basis of their membership in one or more of these protected classes.

The FHA prohibits intentional discrimination under the rubric of a disparate-treatment claim. In *Inclusive Communities*, the Supreme Court construed FHA § 804(a)

(codified at 42 U.S.C. § 3604(a)) also to encompass unintentional discrimination by way of what has been termed a disparate-impact claim.[4]   576 U.S. at 533.   Appellants claim the District is liable on both disparate-impact and disparate-treatment theories.

## I.   Disparate-Impact Claim

Under a disparate-impact theory, the FHA "forbids actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason." *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 503 (9th Cir. 2016).   Disparate-impact theory serves two

---

[4] Notably, Appellants appeared in the district court to ground their claims in FHA § 804(b), not FHA § 804(a).  The district court sua sponte observed that, of these two provisions, the Supreme Court in *Inclusive Communities* examined only FHA § 804(a), which makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person" because of their membership in a protected class.  The Court held that § 804(a) does permit disparate-impact claims.  The Court did not address whether disparate-impact claims were also permitted under § 804(b).  The district court noted the language of § 804(b) differs significantly from § 804(a)—indeed § 804(b) does not contain the phrase "otherwise make unavailable," which was "of central importance" to the Supreme Court's analysis. *Inclusive Communities*, 576 U.S. at 534.  The district court suggested that the Supreme Court's reasoning may not extend to permit disparate-impact claims brought pursuant to § 804(b).  The district court raises an important issue.  However, our circuit has already held that disparate-impact claims are permitted under § 804(b). *See Ojo v. Farmers Grp., Inc.*, 600 F.3d 1201, 1203 (9th Cir. 2010).  *Inclusive Communities* did not expressly upset this holding and neither party has argued, either in the district court or on appeal, that we should revisit that holding in light of *Inclusive Communities*.  As such, we assume without deciding that *Ojo* survives *Inclusive Communities* and that FHA § 804(b) permits disparate-impact claims.

goals: it allows "plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment," *Inclusive Communities*, 576 U.S. at 540, and it targets "'artificial, arbitrary, and unnecessary barriers' to minority housing . . . that can occur through unthinking, even if not malignant, policies," *Ave. 6E*, 818 F.3d at 503 (quoting *Inclusive Communities*, 576 U.S. at 540).

Disparate-impact theories of liability are available pursuant to a number of federal antidiscrimination statutes, including the Civil Rights Act of 1964 (both Titles VI and VII) and the Age Discrimination in Employment Act ("ADEA"). *See Inclusive Communities*, 576 U.S. at 530–33. In *Wards Cove Packing Co. v. Atonio*, the Supreme Court developed a three-step burden-shifting framework to address these types of claims.  490 U.S. 642 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e–2(k).[5] Although *Wards Cove* dealt specifically with Title VII, the Supreme Court has applied the framework across federal antidiscrimination statutes.  *Hardie v. Nat'l Collegiate Athletic Ass'n*, 876 F.3d 312, 319 n.8 (9th Cir. 2017).  We review Appellants' FHA disparate-impact claims under this burden-shifting framework but note that the framework may differ in application in certain respects.  *See Inclusive Communities*, 576 U.S. at 533–35, 541 ("[T]he Title VII framework may not transfer exactly to the fair-housing

---

[5] "The Civil Rights Act of 1991 abrogated *Wards Cove* with respect to claims under Title VII, but the Supreme Court has continued to apply *Wards Cove* burden shifting to other antidiscrimination statutes." *Hardie v. Nat'l Collegiate Athletic Ass'n*, 876 F.3d 312, 319 n.8 (9th Cir. 2017) (citation omitted).

context, but the comparison suffices for present purposes."); *Ave. 6E*, 818 F.3d at 512–13.

In general terms, under the burden-shifting framework, the plaintiff first has the burden to establish a prima facie case of disparate-impact discrimination under the FHA. *Ojo v. Farmers Grp., Inc.*, 600 F.3d 1201, 1203 (9th Cir. 2010). If the plaintiff is able to establish a prima facie case, "the burden shifts to the defendant to either rebut the facts underpinning the prima facie case or to demonstrate a legally sufficient, nondiscriminatory reason for the practices causing the disparate impact."  *Id.* (quotation marks and citation omitted).  Third and finally, the burden shifts back to the plaintiff to show the availability of an alternative practice that has less discriminatory impact yet is still equally effective in serving the defendant's legitimate goals. *Inclusive Communities*, 576 U.S. at 533; *Hardie*, 876 F.3d at 320.

On summary judgment, the district court held that Appellants had failed on the first step.  The court determined that Appellants failed to establish a prima facie case because they did not establish "robust causation" between the District's "race-neutral policy" and the policy's repercussions, which "affect[ed] a disproportionate share of protected-group members."

## A.  Prima Facie Case

The initial burden is on the plaintiff to establish a prima facie disparate-impact claim.   Prior to *Inclusive Communities*, we had already interpreted the FHA to permit disparate-impact claims and held that a prima facie case "require[d] proof of (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type

produced by the defendant's facially neutral acts or practices." *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 711 (9th Cir. 2009) (cleaned up).

However, in recognizing that the FHA permits disparate-impact claims, the Supreme Court in *Inclusive Communities* described in detail a set of "safeguards" that provide additional guidance in assessing the availability of these claims.[6] *Inclusive Communities*, 576 U.S. at 542. These safeguards are necessary to "protect[] defendants from being held liable for racial disparities they did not create" and to prevent disparate-impact liability from "caus[ing] race to be used and considered in a pervasive way"—specifically, through the adoption of numerical quotas, which could lead to "serious constitutional questions." *Id.*

Among these safeguards is "a robust causality requirement," which necessitates that the plaintiff "produce statistical evidence demonstrating a causal connection"

---

[6] In 2013, the U.S. Department of Housing and Urban Development ("HUD") issued a regulation describing the framework for disparate-impact claims brought under the FHA. 24 C.F.R. § 100.500 (2014). Although the Supreme Court mentioned this regulation in *Inclusive Communities*, *see* 576 U.S. at 527, there is disagreement as to whether the Court adopted this framework. *See Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 903 n.6 (5th Cir. 2019). Complicating matters further, in 2020, HUD saw fit to revise its rule in light of the Supreme Court's decision in *Inclusive Communities*, although that rule is currently enjoined. *Mass. Fair Hous. Ctr. v. United States Dep't of Hous. & Urb. Dev.*, 496 F. Supp. 3d 600 (D. Mass. 2020). Given these considerations, we will follow the guidance of the Supreme Court in *Inclusive Communities* rather than look to HUD's regulations. *See Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 (4th Cir. 2018) (acknowledging that the courts of appeals are bound by the standard announced by the Supreme Court, not the prior HUD regulation); *Lincoln Prop.*, 920 F.3d at 903 (following *Reyes*).

between an identified neutral policy and any alleged disparities that adversely affect members of a protected class. *Id.* at 542–43. The function of this requirement is to limit disparate-impact claims only to instances where it is the defendant's policy or practice that causes an adverse, disproportionate effect. *Id.* at 527 ("If a statistical discrepancy is caused by factors other than the defendant's policy, a plaintiff cannot establish a prima facie case, and there is no liability."). In other words, robust causality requires that plaintiffs prove with a preponderance of the evidence[7] that the policy itself, and not some other factor (such as unrelated or uncontrollable societal determinants, government mandates that limit a defendant's discretion, or even other unchallenged policies of the defendant), created or exacerbated a disproportionate effect. *Id.* at 542 (The "robust causality requirement ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." (alterations in original) (quoting *Wards Cove*, 490 U.S. at 653)). Otherwise, the Supreme Court observed, defendants may attempt to protect themselves from liability by "resort[ing] to the use of racial quotas" to engineer policies that do not result in any statistical disparities, even if the policy was never the cause of the disparity in the first place. *Id.* at 521 ("Courts should avoid interpreting disparate-impact liability to be so expansive as to inject racial considerations into every housing decision.").

Therefore, in light of *Inclusive Communities*, we must clarify our standard. For a plaintiff to make out a prima facie case of disparate impact, he must demonstrate: (1) the

---

[7] Of course, at the summary judgment stage the plaintiff need adduce only evidence that would allow this ultimate finding.

existence of a policy, not a one-time decision, that is outwardly neutral; (2) a significant, adverse, and disproportionate effect on a protected class[8]; and (3) robust causality that shows, beyond mere evidence of a statistical disparity, that the challenged policy, and not some other factor or policy, caused the disproportionate effect.[9]

The district court held that Appellants failed to demonstrate robust causality. We hold that the district court erred in that judgment. We conclude that Appellants did establish robust causation and did meet their prima facie burden.

---

[8] Appellants here allege that they are members of the class of persons against which the District discriminated; Appellants' alleged injury here was a direct result of that discrimination. But the FHA does permit suits by plaintiffs outside the class of persons discriminated against, *see, e.g.*, *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 210, 211–12 (1972) (holding that plaintiffs not themselves the "direct objects of discrimination" have standing under the FHA), so long as those plaintiffs can allege and prove that their injury was proximately caused by the discrimination against the class of persons, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) ("[A] statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute.").

[9] Some courts have also required plaintiffs to plead facts demonstrating that the targeted policy is "arbitrary, artificial, and unnecessary." *See, e.g.*, *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1112 (8th Cir. 2017); *Khan v. City of Minneapolis*, 922 F.3d 872, 874 (8th Cir. 2019). Because this appeal is brought pursuant to the district court's grant of summary judgment and because the District did not move to dismiss or for judgment on the pleadings below, we need not address whether such a requirement exists.

### 1.  *Identification of an Outwardly Neutral Policy*

Appellants have identified an outwardly neutral policy. The District's Security Deposit Policy requires public housing residents (tenants of Pinal County) to pay an $180 refundable security deposit.  Non-public housing residents are not subject to that increase and pay only $55.  Persons who are residents of public housing are not a protected class. *See* 42 U.S.C. § 3604(b).  The policy does not explicitly treat customers differently based on their membership in any recognized protected class.  The policy is not a one-time decision.

### 2.  *Significant,  Adverse,  and  Disproportionate Effect on Members of a Protected Class*

Before any statistical disparate-impact analysis can proceed, the correct comparative populations must be identified.  There are multiple valid methods of analysis involving different comparative populations.  *See* Robert G. Schwemm & Calvin Bradford, *Proving Disparate Impact in Fair Housing Cases After Inclusive Communities*, 19 N.Y.U. J. Legis. & Pub. Pol'y 685, 698–99, 703–06 (2016).  One method that we have identified as a valid "basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 519–20 (9th Cir. 2011) (quoting *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003)).

When a defendant makes a deliberate choice to subject only a subset of its customers or constituents to a certain policy, it is proper to compare the demographics of that subset to the larger population of clients to which the policy does not apply to discern whether the decision to limit a

policy to that subset produced any disproportionate effect. Appellants used this type of statistical analysis, comparing affected and unaffected populations.  Appellants' expert compared (1) those District customers to whom the Security Deposit Policy applied (public housing residents of Pinal County); and (2) those remaining District customers to whom the policy did not apply (non-public housing residents) to determine whether the affected population was overrepresented by certain members of protected classes. This is a proper comparison.[10]

However, the district court here incorrectly limited its analysis to those adversely affected by the policy, *i.e.*, public housing residents only.  The district court held that Appellants failed to demonstrate that the protected-group-member residents of Edwards Circle were disproportionately affected by the policy by undertaking an analysis in which the court compared them not to unaffected (non-public housing) District customers, but only to the non-protected-group members of Edwards Circle.  The court concluded that, of those affected by the policy, "[e]verybody is treated the same, and experiences the same outcome, regardless of membership in a protected group."  That comparison ignores a critical element of the District's Security Deposit Policy: that, to begin with, it applied only

---

[10] We note, however, that a policy that is generally applicable and that does not explicitly apply only to a subset based on a particular characteristic may require a different analysis or consideration of idiosyncratic factors to isolate the "affected" population.  *See Darensburg*, 636 F.3d at 520 (holding that the plaintiffs' statistical demonstration concerning the disproportionate effect on minorities of an infrastructure expansion plan that devoted more resources to rail lines than to bus lines identified the wrong "affected" population—the affected population was potential new riders on the expanded rail and bus lines, not riders of existing lines).

to a subset of the District's overall customer base. To resolve whether the District's decision to apply the Security Deposit Policy only to public housing residents resulted in a disparate impact, the proper comparative population is the District's public housing *and* non-public housing residents.

Appellants' statistical analysis shows that, as compared to the District's overall customer base, a disproportionate percentage of the District's Edwards Circle customers (*i.e.*, heads of households) are: African Americans (38.9% to 2.9%), Native Americans (16.7% to 2.2%), and, as relevant to both Peters and Peña, unmarried women with children (89.0% to 34.3%). By comparison, 11.1% of Edwards Circle customers are White, while 45.0% of the District's customer base is White. Using the proper comparison populations, we see that the Security Deposit Policy disproportionately impacted African Americans, Native Americans, and households headed by unmarried women with children.

That the policy has a disproportionate effect is not enough, though; the disparity must also be significant. *Wards Cove*, 490 U.S. at 656. Analyses with small sample sizes (Edwards Circle contains only twenty residences) raise a red flag when assessing whether a plaintiff has identified a significant disparity. *Stout v. Potter*, 276 F.3d 1118, 1123 (9th Cir. 2002) ("We observe initially that the probative value of any statistical comparison is limited by the small available sample. . . . A sample involving 6 female applicants in a pool of 38 applicants is likely too small to produce statistically significant results."). Nevertheless, Appellants' unchallenged expert report concluded that the statistical disparities here are statistically significant— meaning there is a "high probability" that they "did not occur by chance."

The expert report also demonstrates the disparities have a practical significance.[11] *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2343 n.17 (2021).  The gaps in representation by African Americans, Native Americans, and single mothers in the public housing population as compared to the non-public housing population are large: African Americans are nearly four times as likely and Native Americans are nearly twice as likely to be public housing customers than Whites.

The District did not offer its own statistical evidence or otherwise identify errors or omissions in the Appellants' expert evidence.  Given the District's lack of contrary evidence, we must conclude that the Appellants' statistical evidence adequately suggests a material and significant disproportionate effect on members of these protected

---

[11] "Significance" in the context of disparate-impact claims is not limited to statistical significance; "practical significance," which examines whether minor statistical disparities have any discriminatory effect in practice, also plays a role. *See Brnovich*, 141 S. Ct. at 2343 n.17 ("Statistical significance may provide evidence that something besides random error is at work, but it does not necessarily determine causes, and as the dissent acknowledges, it is not the be-all and end-all of disparate-impact analysis." (cleaned up)); *id.* ("[S]ignificant differences . . . are not evidence that [what is at work] is legally or practically important. Statisticians distinguish between statistical and practical significance to make the point.  When practical significance is lacking—when the size of a disparity is negligible—there is no reason to worry about statistical significance." (quoting Federal Judicial Center, Reference Manual on Scientific Evidence 252 (3d ed. 2011)); *id.* at 2358 n.4 (Kagan, J., dissenting) ("I agree with the majority that 'very small differences' among racial groups do not matter. . . . In addition, there may be some threshold of what is sometimes called 'practical significance'—a level of inequality that, even if statistically meaningful, is just too trivial for the legal system to care about.").

groups.[12]   Therefore, we hold Appellants succeeded in establishing a prima facie case that the Security Deposit Policy had a significant, adverse, and disproportionate effect on members of a protected class.

### 3.  *Robust Causation*

Finally, Appellants must demonstrate "robust causality," which requires a plaintiff who has identified both a defendant's neutral policy and a statistical disparity to demonstrate a "robust" causal link between the two. *Inclusive Communities*, 576 U.S. at 543.  The function of robust causation is to resolve whether the adverse and disproportionate outcomes that arose after a challenged policy was implemented can be traced to the policy rather than to other potential causes or factors.  This is not a difficult inquiry here.

The robust causation requirement derives most notably from *Wards Cove*.  490 U.S. at 656; *see also Inclusive Communities*, 576 U.S. at 542 (citing *Wards Cove* in discussing the "robust causality requirement").  In *Wards Cove*, plaintiff cannery workers complained that several policies (including nepotism, rehiring preferences, and subjective decision making) caused lower-paying cannery positions to be disproportionately occupied by minorities while higher-paying non-cannery positions (managerial positions) were disproportionately occupied by White people. 490 U.S. at 656–57.  The Supreme Court explained that, to show causality, plaintiffs were first "responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical

---

[12] Neither does the District contest that the increase of a required, up-front security deposit to $180 operates as a significant adversity.

disparities." *Id.* at 656 (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)).  Then, plaintiffs had to "demonstrate that the disparity they complain of is the result of one or more of the [defendant's] practices that they are attacking . . . , specifically showing that each challenged practice has a significantly disparate impact . . . .  To hold otherwise would result in employers being potentially liable for 'the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces.'" *Id.* at 657 (quoting *Watson*, 487 U.S. at 992).

Drawing from *Wards Cove*, the Supreme Court in *Inclusive Communities* further elaborated on the robust causality requirement: "[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."  576 U.S. at 542.  This "ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (quoting *Wards Cove*, 490 U.S. at 653).  "If a statistical discrepancy is caused by factors other than the defendant's policy, a plaintiff cannot establish a prima facie case, and there is no liability." *Id.* at 527.

Here, because the District explicitly applied the adverse effects of the policy—increasing the security deposit to $180—only to a subset of its customer base, the causation analysis is not all that complicated.  The adverse impact complained about by Appellants derives wholly from the innerworkings of the policy.  For no reason other than the District's decision to create two different security deposit amounts for its public housing customers and for its private housing customers did the disparate impact arise.  After the implementation of the policy and as a direct result of it, a

disproportionate percentage of protected-group members were subject to an increased security deposit.

Importantly, the adverse effect here is not some broad social condition. *Cf. Inclusive Communities*, 576 U.S. at 526–27, 543 (signaling that plaintiffs on remand may find it "difficult to establish causation because of the multiple factors that go into investment decisions about where to construct or renovate housing units"). Appellants are not complaining that the Security Deposit Policy contributed to an overrepresentation of protected-group members in public housing. Rather, Appellants complain that the District's tying security deposit prices to public housing status directly caused the discrete adverse effect of an increased security deposit to apply disproportionately to members of protected groups. As such, it is not the case that we are left wondering whether members of a protected class are subject to the increased fee because of this policy or because of some other factor. *Cf. Wards Cove*, 490 U.S. at 653–54 (holding causation was not demonstrated because plaintiffs had not disproved the possibility that the overrepresentation of minority workers in lower-paying cannery positions was caused by the company's contract with a predominantly non-White labor union). The sole cause of the disproportionate impact of the increased security deposit was the District's decision to apply the policy only to a subset of its customers.[13] In holding that Appellants established robust causation sufficient to carry their burden of establishing a prima facie case, we reject the district court's analysis. Again, the district court ignored the fact that the policy

---

[13] We also note that, based on its conversations with Pinal County employees, the District likely knew that Edwards Circle was overrepresented by certain members of FHA-protected groups, but adopted the policy change anyway.

bifurcated the District's customer base into two groups consisting of public versus private housing customers.

Finally, as the district court noted, some debate has developed about the contours of the robust causality requirement. *See Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 903–05 (5th Cir. 2019) (describing four different views among the Fourth, Eighth, and Eleventh Circuits). We need not enter that debate. This is a simple case where the policy explicitly bifurcated a population based on a non-protected characteristic: public housing. That bifurcation generated a disproportionate effect that would not have existed in its absence and ensured the adverse effects of the policy applied only to the population subset that was overrepresented (in comparison to the overall District customer population) by certain members of a protected group. The clarity of that causal relationship sets it apart from other cases.

The district court erred in holding that Appellants failed to establish a prima facie case of disparate-impact discrimination under the FHA. We move on to the second step of the disparate-impact analysis.

## B. Legitimate Business Interest

After the plaintiff successfully demonstrates a prima facie case, the burden shifts, and the defendant is given an opportunity to avoid liability by providing evidence that the challenged policy significantly serves a legitimate business interest. The district court, which held in error that Appellants did not establish a prima facie case, stopped short of addressing the remainder of the analysis. "We may affirm the district court's grant of summary judgment on any ground supported by the record, regardless of whether the district court relied upon, rejected, or even considered that

ground." *Am. Fed'n of Musicians of U.S. & Canada v. Paramount Pictures Corp.*, 903 F.3d 968, 981 (9th Cir. 2018) (cleaned up).[14] We conclude there is no genuine issue of material fact that the District demonstrated a legitimate business justification for implementing the Security Deposit Policy and that the policy served that interest in a significant way.

"Governmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers.'" *Inclusive Communities*, 576 U.S. at 543 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 436 (1971)). Accordingly, "[a]n important and appropriate means of ensuring that disparate-impact liability is properly limited is to give housing authorities and private developers leeway to state and explain the valid interest served by their policies." *Id.* at 541. "This step of the analysis is analogous to the business necessity standard under Title VII . . . [j]ust as an employer may maintain a workplace requirement that causes a disparate impact if that requirement is a 'reasonable measure[ment] of job performance,' so too must housing authorities and private developers be allowed to maintain a policy if they can prove it is necessary to achieve a valid interest." *Id.* (alteration in original) (citation omitted) (quoting *Griggs*, 401 U.S. at 431). "While the defendant must produce evidence that the practice serves legitimate ends, '[t]he ultimate burden of proving that discrimination

---

[14] Because we may affirm a grant of summary judgment on any basis supported by the record, there is no reason to remand to the district court. *Am. Fed'n of Musicians*, 903 F.3d at 981. Discovery has closed and the record is complete. Whether the District's Security Deposit Policy serves a legitimate business interest was fully briefed in the district court and on appeal. As such, the district court judge would not be in a better position to resolve this issue in the first instance on remand.

against a protected group has been caused by a specific . . . practice remains with the plaintiff at all times.'" *Hardie*, 876 F.3d at 320 (alteration in original) (quoting *Wards Cove*, 490 U.S. at 659).

Although the Supreme Court in *Inclusive Communities* used the phrase "business necessity" to describe this step of the analysis, that term is somewhat of a misnomer. First, the defense is available not only to businesses but also to individuals and public entities. *Inclusive Communities*, 576 U.S. at 541. Second, the standard is not "necessity": the defendant need not demonstrate that the challenged policy is "'essential' or 'indispensable'" to its business—only that the policy "serves, in a significant way," its legitimate interests. *Wards Cove*, 490 U.S. at 659; *accord Hardie*, 876 F.3d at 320 ("The defendant's practice need not be 'essential' or 'indispensable' to achieving its stated goal, but the relationship between the practice and its purpose must be more than 'insubstantial.'" (quoting *Wards Cove*, 490 U.S. at 659)).[15] To require that a business or government show that a challenged policy is "necessary" to its interests would be to render the defense a nullity. *Cf. Wards Cove*, 490 U.S. at 659 ("[T]here is no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's

---

[15] Although *Hardie* arose in the Title II (which bars discrimination in public accommodations) context, it was decided after *Inclusive Communities* and favorably cites to *Inclusive Communities* and *Wards Cove*. Because "[n]either the Supreme Court nor we have decided whether disparate-impact claims are cognizable under Title II," *Hardie* drew directly from the Supreme Court's Title VII precedent. *Hardie*, 876 F.3d at 319 (assuming without deciding that Title II permitted disparate-impact theories). Given the Supreme Court's example in analogizing to Title VII precedents, we think it proper to use *Hardie* to help guide the analysis here. *See Inclusive Communities*, 576 U.S. at 541.

business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet."). At end, it is defendant's burden at this stage to show (1) a legitimate business interest, and (2) that the practice or policy serves in a significant way that legitimate interest.

Here, it is undisputed that the District articulated a legitimate business interest. The record demonstrates that residents at Edwards Circle had previously left delinquent accounts in excess of their security deposit, which the District could not recover from Pinal County. The District accordingly sought to create a policy that would prevent losses produced by such delinquencies in the future. It is self-evident that a business has a legitimate interest to be paid in full for services it has already provided pursuant to a valid contract. Considered in the aggregate, that right implicates the legitimate interest that a business has in maintaining fiscal solvency.

The next question is whether the District's Security Deposit Policy serves that interest in a significant way. It is the District's burden to establish that the challenged portions of the policy, *i.e.*, those "practices causing the disparate impact," significantly serve its business interest. *See Ojo*, 600 F.3d at 1203; *Hardie*, 876 F.3d at 320. Here, that includes the decision to apply the policy only to public housing customers and the decision to increase the deposit to $180, rather than some other dollar figure. We conclude there is no genuine issue of material fact as to whether the District established that both aspects of the Security Deposit Policy serve in a significant way its valid business interests.

The District's decision to apply the Security Deposit Policy only to public housing tenants of Pinal County was directly related to its interest in protecting itself against unrecovered delinquencies. It is uncontested that the

District's default recovery policies—namely, demanding payment from the landlord and placing a lien on the property—were not effective to recover money from those tenants' landlord—Pinal County—purportedly due to the County's status as a public entity.  Unlike other District customers who leased out their property, Pinal County refused to reimburse the District for delinquencies left by its tenants.  The County also resisted the District's efforts to recover by way of liens and their executions.  The County further refused to use its public funds to pay the defaulting tenants' water bills on the basis that such payments would violate the Arizona state constitution.

Thus, the only customers for whom the District required an alternative recovery policy were those whose landlord was Pinal County—*i.e.*, its public housing customers.  The unique relationship between the District and Pinal County was adequate justification for the District to issue the prophylactic Security Deposit Policy.  Appellants question whether the policy truly served the District's interest in fiscal solvency because Edwards Circle tenants represent only a small portion of the District's full customer base.  But protecting against any otherwise unrecoverable financial loss is a valid interest served by the policy.  To that end, Appellants fail to explain why the District should simply lose the amounts of any delinquent public housing water bills.  Appellants also argue that recovering delinquencies from Edwards Circle is not necessary for the District's financial solvency because the delinquencies were de minimis.  But a policy need not be essential or indispensable to significantly serve a legitimate interest; moreover, Appellants offer no meaningful limiting principle as to how

minor a potential financial loss must be before a business may not protect itself against it.[16]

Neither is there a triable issue as to whether the District's decision to increase the security deposit to $180, rather than a smaller amount, serves in a significant way the District's legitimate interest in guaranteeing that it will receive full payment for services rendered. The record includes delinquent account balances left by Edwards Circle residents at various times between 2010 and 2015. At the time the policy was first announced (November 2014), the District had multiple delinquent Edwards Circle accounts still on the books, including one delinquent account from 2011 that amounted to $184.45.[17] The District's designated Rule 30(b)(6) representative witness expressly testified at deposition that the District chose a dollar figure that would cover the largest outstanding accounts to prevent loss to the company:

> I looked—my rationale was the fact that we need to be able to cover the delinquent accounts and protect the District from having to pay—provide water at no cost to those accounts. And I—if I remember correctly, it

---

[16] As the District notes, Appellants incorrectly point to the District's "net assets" in arguing the size of the delinquencies are inconsequential. But they do not explain how the value of a company's assets (*e.g.*, underground water pipes, pumps, vehicles, office equipment, easements, etc.) is relevant to whether unpaid accounts receivable impact a business's daily operation or financial commitments. Appellants did not offer evidence on the District's cash flow. But even were the cash flow positive, that would not delegitimatize the District's interest in seeking to have its water bills paid.

[17] Appellants fail to cite to any record evidence that proves this 2011 delinquency statement is inaccurate.

> was basically looking at a range of delinquent accounts and looking at one that would encompass to capture most of those so that we did not suffer a loss as far as the District goes.

That stated rationale is supported by the evidence: The dollar figure of the increased security deposit in the policy ($180) is nearly equivalent to the District's largest outstanding delinquency in the record ($184.45).

Appellants cite no record evidence contradicting the District's expressed intent to key the deposit amount to past delinquencies. Instead, Appellants argue that $180 is an arbitrary figure. As the record demonstrates, that clearly is not the case. It was not picked out of the blue, but because of a specific account in the red.

Now, had the District set the security deposit at clearly excessive amounts relative to predictable monthly water bills for individual units (say, $500 or $1000), or had the District failed to proffer evidence that its security deposit amount was keyed to the size of the largest delinquency (with accompanying documentary support), or had the District decided not to make the security deposit refundable to public housing tenants who did not leave behind delinquent accounts, then Appellants might have raised a triable issue as to whether the policy served the legitimate goal of preventing financial loss to the District from delinquencies. But Appellants did not provide any such evidence.

The District provided evidence that the amount of its security deposit significantly served its legitimate business interest. Appellants are not entitled to assert in response that, in their estimation, the District could have recouped most,

though not all, of its costs related to delinquencies with a lower deposit amount and that the District should be content with that. A plaintiff may attempt to rebut the defendant's proof that it has a substantial basis for setting the cost of the deposit at a certain dollar figure by showing the cost is either not substantially related to the loss to be prevented or pretextually high—but plaintiffs may not simply assert a business's interest is illegitimate because the plaintiff does not believe the financial losses at issue are worth preventing. That is nothing more than subjective second-guessing the sound exercise of a business's discretion. *See Inclusive Communities*, 576 U.S. at 540–41.

We therefore conclude that there is no triable issue of material fact as to whether the District demonstrated a legitimate business justification for implementing the Security Deposit Policy.

## C. Equally Effective, Less Discriminatory Alternative

In the final step of the disparate-impact analysis, "if the defendant provides a legitimate justification for the challenged practice, the plaintiff must demonstrate that an alternative practice (1) would 'serve the defendant's legitimate interests,' and (2) would not have a 'similarly undesirable . . . effect [on members of protected groups].'" *Hardie*, 876 F.3d at 320 (quoting *Wards Cove*, 490 U.S. at 660) (cleaned up). "[B]efore rejecting a business justification . . . a court must determine that a plaintiff has shown that there is 'an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs.'" *Inclusive Communities*, 576 U.S. at 533 (third and fourth alterations in original) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009)). "The plaintiff's proposed alternative(s) must be 'equally effective' as the defendant's

chosen policy at serving the defendant's interest(s), taking into account '[f]actors such as the cost or other burdens' that alternative policies would impose." *Hardie*, 876 F.3d at 320 (quoting *Wards Cove*, 490 U.S. at 661); *see also Watson*, 487 U.S. at 998. "'Courts are generally less competent than employers to restructure business practices,' consequently, the judiciary should proceed with care before mandating that an employer must adopt a plaintiff's alternative . . . ." *Wards Cove*, 490 U.S. at 661 (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978)).

In *Inclusive Communities*, the Supreme Court clarified the limited scope of the third step and implemented safeguards to ensure that housing authorities and private developers are given "leeway to state and explain the valid interest served by their policies." 576 U.S. at 541–42. "The FHA is not an instrument to force [defendants] to reorder their priorities. Rather, the FHA aims to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation." *Id.* at 540. "The limitations on disparate-impact liability discussed here are also necessary to protect potential defendants against abusive disparate-impact claims. . . . Were standards for proceeding with disparate-impact suits not to incorporate at least the safeguards discussed here, then disparate-impact liability might displace valid governmental and private priorities, rather than solely removing artificial, arbitrary, and unnecessary barriers. And that, in turn, would set our Nation back in its quest to reduce the salience of race in our social and economic system." *Id.* at 544 (cleaned up).

At summary judgment, the burden on the plaintiff at the third step is not only to present potential alternatives, but to provide evidence that equally effective and less discriminatory alternatives exist. *Watson*, 487 U.S. at 997–

98.  Appellants here provide *arguments* but fail to present *evidence* sufficient to allow a jury to conclude that any equally effective, less discriminatory alternatives exist to the Security Deposit Policy.  Moreover, these arguments are not persuasive.

As a first alternative, Appellants contend that the District could have continued to attempt to force Pinal County to pay for any delinquencies, either by negotiating an intergovernmental agreement, by requesting a resolution from the County Board of Supervisors, or by filing a declaratory relief action in court.  However, as already recounted, the District attempted numerous times over several years to convince Pinal County to pay its tenants' delinquencies, all without success.  Appellants suggest Pinal County's legal claims (that its public property was immune from liens and that the anti-gift clause of the Arizona Constitution prevented the County from paying its tenants' delinquencies) were infirm and the District should have filed a declaratory action in court rather than take the County at its word.  But requiring the District to file a declaratory action against Pinal County would create costly and time-consuming burdens for the District and it is not clear that the District would prevail.  Appellants have not presented evidence sufficient to create a material triable issue of fact that these alternatives would be equally effective.

Appellants next argue that the District should instead seek to collect the delinquencies from the public housing customers responsible rather than institute a prophylactic security deposit policy.  Setting aside the fact that letters sent to Pinal County show the District did unsuccessfully attempt to collect from these customers, Appellants do not supply any evidence that this alternative would be less burdensome or equally effective than a refundable security deposit.  It

likely would not be as it would require the District to recoup delinquent accounts through a collections agency from customers who have already shown an inability or disinterest in paying their utility bill and for whom the District no longer has valid current addresses.[18]   Alternatively, Appellants argue that the District can cover for delinquent account losses by siphoning money from the District's own operating revenue.   But for us to require such measures would deny that businesses have a valid right to guarantee full payment from individual clients.

Finally, Appellants propose the District apply the Security Deposit Policy to all its customers, rather than applying it solely to public housing residents.  Requiring the District to increase all its customers' costs and burdens by applying the Security Deposit Policy regardless whether their landlords comport with the District's requirement that landlords pay tenant delinquencies may annul the disparate impact, but it is not a reasonable alternative given this record.  We must also take into account the costs and burdens of proposed alternatives.   *Hardie*, 876 F.3d at 320. Mandating the District to discard the rational tailoring of the Security Deposit Policy incorrectly signals that justified, deliberate, and legitimate policies, which impact protected groups, violate the FHA.  This is improper.  *See Inclusive Communities*, 576 U.S. at 521 ("Policies, whether governmental or private, are not contrary to the disparate-impact requirement unless they are artificial, arbitrary, and unnecessary barriers." (quotation marks and citation omitted)).  Neither would increasing the security deposit of

---

[18] Appellants also suggest pegging the security deposit to a tenant's payment history or credit rating or to reduce the size of the security deposit but provide no evidence that either solution is equally effective or would be less discriminatory.  Counsel's suggestions are not evidence.

all customers to some amount lower than $180 be an equally effective method of protecting against a delinquent balance left by a tenant with an immune landlord.  Because the District must refund the security deposit of each customer who does not leave behind an outstanding balance, it cannot take funds from one customer's security deposit to cover a delinquent balance left by another customer—or, if it does do so as a temporary measure, it must eventually use its own funds to replenish that first tenant's deposit.  Thus, increasing every customer's security deposit to some amount lower than $180 will likely still leave the District vulnerable to financial loss.

Ultimately, the district court erred by choosing the wrong comparator population when it held that the Appellants failed to establish a prima facie case of disparate impact.  However, the District established a nondiscriminatory legitimate business interest in applying the Security Deposit Policy only to Pinal County tenants and for raising the deposit to $180, and that these interests were served in a significant way by that policy.  Appellants have not identified any genuine issue of material fact that would disturb that conclusion and have failed to carry their burden in establishing any less discriminatory, equally effective alternative to the District's policy.

Although the district court's analysis at the prima facie stage was in error, we affirm the district court's grant of summary judgment to the District on the disparate-impact claim.

## II. Disparate-Treatment Claim

Appellants attempted to defeat the District's motion for summary judgment by arguing that their complaint also alleged a disparate-treatment cause of action.  The district

court rejected that argument, concluding that Appellants had failed to allege a disparate-treatment claim under the FHA and, even if they had, had supplied insufficient evidence to establish a genuine dispute of material fact. While we affirm, we conclude the district court erred in finding that Appellants did not make it known in discovery that they would pursue a disparate-treatment claim. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000). We nonetheless affirm the district court because Appellants failed to adduce evidence sufficient to allow a reasonable jury to conclude that the District was liable under a disparate-treatment theory.

We have held in the analogous ADEA context that a plaintiff may not pursue an alternative discrimination theory unless plaintiffs "either (1) [pleaded] the additional disparate impact [or treatment] theory in their complaints, or (2) [made] known during discovery their intention to pursue recovery on the disparate impact [or treatment] theory omitted from their complaints. Only if the defendants have been put on notice may the plaintiffs proceed on a disparate impact [or treatment] theory at the summary judgment stage." *Id.*

Unlike for disparate-impact claims, allegations that discrimination was a motivating factor behind a defendant's actions are essential to plead a disparate-treatment claim. Ultimately, at the summary judgment stage, the plaintiff must "produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely that not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Ave. 6E*, 818 F.3d at 504 (9th Cir. 2016) (quoting *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013)).

Appellants' amended complaint did not articulate any theory of disparate treatment.  Essential terms such as "disparate treatment," "motivating factor," and "discriminatory purpose" do not appear anywhere.  Nor are there allegations of improper animus or any discussion of the District's purpose in instituting the policy.  Instead, the complaint reads as a traditional disparate-impact complaint: it lists demographic statistical disparities among the Edwards Circle population and describes the disproportionate harm that the policy allegedly caused.

However, we have held that a plaintiff may provide notice of their intent to pursue either a disparate-impact or disparate-treatment claim during discovery.  *Coleman*, 232 F.3d at 1294.  Notice in the complaint is preferred.  *Id.* at 1292.  Thus, to avoid prejudicing the defendant, notice provided during discovery should be made early and should clearly demonstrate the plaintiff is collecting evidence to establish the alternative theory.

For example, in *Coleman*, plaintiffs pursued an ADEA disparate-treatment discrimination claim in their complaint and in discovery, but never raised a disparate-impact claim before summary judgment.  *Id.* at 1292–93.  We held that because the defendant was given "no notice either in the complaint, in documents submitted with the complaint, or in any document prior to their motions for summary judgment that they intended to argue this theory," the district court did not err when it barred plaintiffs from asserting the theory at summary judgment.  *Id.* at 1294 n.8.

That is not the case here.  Documents submitted to the district court prior to discovery demonstrate that the District was aware that Appellants were attempting to bring a disparate-treatment claim.  The District signed on to a joint case management plan filed prior to discovery which recited

as an issue in dispute "[w]hether race, color, [etc.] was a motivating factor in committing the challenged practices." Indeed, even prior to that, the District indicated it was aware that Appellants intended to pursue a disparate-treatment theory when it listed in its amended answer the affirmative defense that "discrimination was not a motivating factor" (an element unique to a disparate-treatment claim). The District could have sought to dismiss a claim for disparate treatment under Federal Rule of Civil Procedure 12(b)(6) or sought a more definitive statement under Rule 12(e) but failed to do so. Instead, the District's own statements to the court demonstrate that the District had notice of Appellants' potential disparate-treatment claim. Therefore, the District had notice and was not prejudiced by Appellants' disparate-treatment claim.

However, the district court did not err in holding that Appellants failed to present evidence sufficient to establish a genuine dispute of material fact regarding disparate treatment. To defeat a motion for summary judgment, Appellants were required to establish that there was a genuine issue of material fact as to whether "a discriminatory reason more likely than not motivated the defendant." *Ave. 6E*, 818 F.3d at 504 (quotation marks and citations omitted). Proof may come in the form of either "direct or circumstantial evidence." *Pac. Shores Props.*, 730 F.3d at 1158. Typically, we apply the multi-factor inquiry from *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266 (1977), to assess whether a plaintiff has established a triable issue of fact that the defendant's actions were motivated by discriminatory intent. We examine "the events leading up to the challenged decision and the legislative history behind it, the defendant's departure from normal procedures or substantive conclusions, and the historical background of the decision

and whether it creates a disparate impact." *Ave. 6E*, 818 F.3d at 504 (citing *Arlington Heights*, 429 U.S. at 266–68).  But Appellants have not adduced sufficient evidence that the District had a discriminatory motive.

Appellants presented insufficient direct evidence of discriminatory animus in the lead-up to the policy's adoption.  Appellants' only argument is to point to a statement in deposition by a District board member that he did not "think [Pinal County was] as accountable as they should have been for their property, for managing the influx of people and tenants and that type of thing."  Appellants argue, without citation to any evidence, direct, circumstantial, or expert, that "influx of people and tenants" is code for African Americans, Native Americans, and single mothers.  The district court rejected that argument, concluding these were not "'code word[s]' that demonstrate[d] discriminatory intent."  We agree. Appellants' contention that the phrase "influx of people and tenants" demonstrates discriminatory intent or bias is baseless.  No reasonable jury could conclude from this statement that the District intended to discriminate against Pinal County tenants on the basis of race or familial status.

Neither did Appellants demonstrate circumstantial evidence from which a jury could find discriminatory intent. Appellants' only argument here is that the District was told by Pinal County that increasing the security deposit only for residents of Edwards Circle would affect mostly members of "a protected class" and violate fair housing law, and that this is conclusive evidence to establish an inference of discriminatory motive.  While a defendant's knowledge of a policy's potential discriminatory impact may be relevant circumstantial evidence in proving animus, it is not sufficient here.  As explained above, the District's decision

to apply the Security Deposit Policy is readily explainable on grounds of common-sense business practices: businesses must be paid for their services to stay in business. These grounds are other than race or familial status. Nor is there any evidence that the District's business-related grounds were pretextual. A demonstration that a business may have known that a challenged policy could result in a disproportionate impact on certain members of a protected class is simply not sufficient on its own to impose liability for a disparate-treatment claim.[19]

Because the Appellants did not establish a genuine issue of material fact as to whether the District had a discriminatory motive, we affirm the district court's order granting the District summary judgment on the disparate-treatment claim.

## CONCLUSION

For the reasons stated above, we **AFFIRM.**

---

[19] Appellants also argue that the District acted with reckless disregard, which the Supreme Court has deemed equivalent to "willful" discrimination in the context of other federal discrimination statutes. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126 (1985). We need not decide whether this standard, which applied to a damages provision of the ADEA, is applicable to disparate treatment liability under the FHA because Appellants have not provided sufficient evidence that the District acted with reckless disregard.